J-A22009-15

2016 PA Super 12

| COMMONWEALTH OF PENNSYLVANIA, | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellee | | |
| v. | | |
| GARY CHARLES SCHULTZ, | | |
| Appellant | | No. 280 MDA 2015 |

Appeal from the Order Entered January 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):
CP-22-CR-0003616-2013
CP-22-CR-0005164-2011

BEFORE:  BOWES, JENKINS, AND PLATT,* JJ.

OPINION BY BOWES, J.:                    **FILED JANUARY 22, 2016**

Gary Charles Schultz appeals from the order denying his pre-trial motions to preclude the introduction of testimony of Attorney Cynthia Baldwin[1] and to quash certain criminal charges against him based on violations of the attorney-client privilege.[2]  After careful review, we reverse

_____

[1]  Ms. Baldwin is a former Justice of the Pennsylvania Supreme Court. Consistent with the parties and trial court below, and to avoid confusion, we have not referred to her as Justice Baldwin since she was not acting in a judicial capacity.

[2] We have jurisdiction over this appeal pursuant to the collateral order doctrine codified at Pa.R.A.P. 313.  We discuss our jurisdiction in more detail in the body of this opinion.

*  Retired Senior Judge assigned to the Superior Court.

the trial court's order in which it found that Schultz was properly represented by Ms. Baldwin during his grand jury testimony as an agent of Penn State and that no attorney-client privilege existed. For the reasons that follow, we also hold that Schultz was constructively denied counsel during his grand jury testimony and that Ms. Baldwin was incompetent to testify as to her communications with him. Accordingly, we quash the counts of perjury, obstruction of justice, and the conspiracy charge.

## Part I: Factual and Procedural Background

In these actions, the Commonwealth has charged Schultz with two counts of endangering the welfare of a child ("EWOC"), and one count each of perjury, failure to report suspected child abuse, obstruction of justice, and conspiracy.[3] The charges stem from: 1) his treatment of allegations of sexual misconduct against Gerald "Jerry" A. Sandusky, the former defensive coordinator for the Penn State football team and founder of a non-profit charity serving underprivileged youth, the Second Mile; and 2) his testimony pertaining to his handling of those matters before an investigating grand jury.[4]

---

[3] The Commonwealth filed a single conspiracy count, which included conspiracy to commit perjury, obstruction of justice, and endangering the welfare of a child.

[4] Our recitation of the facts is based on the certified record, including the grand jury presentments, unsealed testimony, and the factual findings of the
*(Footnote Continued Next Page)*

Schultz is a retired Senior Vice President for Finance and Business for the Pennsylvania State University ("Penn State" or "University"). As part of the responsibilities in that position, Schultz oversaw Penn State campus police. In 2009, the Pennsylvania Office of Attorney General ("OAG") began investigating allegations that Sandusky sexually abused children over an extended period. As part of the investigation, the OAG convened a statewide investigating Grand Jury. During the course of the investigation, the OAG learned of sexual misconduct by Sandusky that occurred while he was on the campus of Penn State in 2001, as well as an incident involving inappropriate behavior with a minor in 1998.

The grand jury investigation revealed the following regarding the 1998 matter. That incident involved an eleven-year-old boy. *See* Thirty-Third Statewide Investigating Grand Jury Sandusky Presentment, 11/4/11, at 18 (hereinafter Sandusky Presentment). Sandusky transported the victim from the victim's home to Penn State. Sandusky Presentment at 18. On the way to the University, Sandusky placed his right hand on the boy's thigh on multiple occasions. *Id*. The pair lifted weights for approximately twenty minutes before playing a game with a tape ball and cups. *Id*. Sandusky

*(Footnote Continued)* ─────────────

trial court that are supported by the record. Insofar as Appellant's testimony was not credited by the trial court, we have not relied on that version of events. However, where the testimony was not in dispute, we have considered it.

then wrestled with the victim, before instructing the boy to shower. *Id*. The youngster attempted to shower away from Sandusky, but Sandusky beckoned him closer and told him that he warmed up a shower for the child. *Id*. at 18-19. Sandusky grabbed the boy from around his waist, lifting him into the air. *Id*. at 19. He also washed the boy's back and bear hugged the child from behind, before rinsing the child's hair. *Id*.

When Sandusky returned the child to the boy's home, the child's mother noticed that his hair was wet and became upset when she discovered that he had showered with Sandusky. *Id*. She reported the matter to University Police, who initiated an investigation. *Id*. University Police conducted a wiretap on Sandusky, with the permission of the boy's mother, recording two conversations. *Id*. Sandusky admitted to showering naked with the child and at one point stated that he wished he were dead. *Id*. at 20. He later told police that he hugged the child in the shower and admitted that it was wrong. *Id*. No charges were ultimately filed.

The grand jury investigation also revealed that in 2001, former Penn State assistant football coach, Michael McQueary, who had been a quarterback at Penn State, witnessed Sandusky commit a sexual assault against a minor victim in a locker room shower on the main campus of the University in February of 2001. *Id*. at 6. McQueary, then a graduate assistant, reported this incident to head football coach Joe Paterno the next day, a Saturday. *Id*. at 7. Paterno, in turn, reported the matter to Athletic

Director Tim Curley the following day. *Id*. Within two weeks of the shower incident, McQueary met with Curley and Schultz. *Id*. McQueary, who testified before the grand jury prior to January 12, 2011, said that he told the pair that he believed he saw Sandusky having anal sex with a minor boy. *Id*.

Schultz was originally subpoenaed in December of 2010 to testify before the investigating grand jury on January 12, 2011. At the time, Schultz was no longer employed by Penn State, having been retired for approximately a year and one-half.[5] Subpoenas were also issued for Curley and Paterno. Penn State general counsel, Attorney Baldwin, accepted service of the subpoena on Schultz's behalf with his permission.[6] Ms. Baldwin also agreed, at the request of Penn State President Dr. Graham Spanier, to advise and be present for Schultz's grand jury testimony. N.T., 10/26/12, at 14. Ms. Baldwin met one time with Schultz prior to his testimony. That meeting occurred on January 5, 2011.[7] Ms. Baldwin related to Schultz that, as a grand jury witness, he was entitled to an attorney who

_____

[5] Schultz would later return on a temporary basis to his former position in September of 2011 until November of 2011, when he was criminally charged.

[6] Ms. Baldwin was also served a subpoena *duces tecum*, Grand Jury Subpoena 1179, for University documents. That subpoena sought documents referencing or related to Jerry Sandusky.

[7] Ms. Baldwin had previously met with Curley on January 3, 2011.

could be present and consult with him during his testimony and that he could retain his own lawyer.  N.T. Schultz Hearing, 11/20/14, at 10-12; *see id*. at 55.  She indicated that she had spoken with Curley and Paterno and that no conflict existed between their recollection and Schultz's and she felt comfortable appearing on behalf of both Curley and him.  *Id*. at 54.  Paterno retained separate counsel.

Ms. Baldwin did not advise Schultz regarding his Fifth Amendment right against self-incrimination.  Ms. Baldwin also did not explain the difference between her representation of Schultz in his individual capacity or as an agent of his former employer, Penn State.  Nonetheless, she did inform Schultz that any information he told her was not confidential insofar as she could relay it to the University Board of Trustees.  *Id*. at 54.  Ms. Baldwin set forth,

> I did tell Mr. Schultz that I was Penn State's general counsel.  I could go in.  I was going in with Mr. Curley.  I was not going in with Mr. Paterno.  Mr. Paterno got his own counsel.
>
> I told him that as long as there was no conflict, that I could go in with him.

*Id*.  Ms. Baldwin did not inform the Board of Trustees of Schultz's statements to her.

On the morning of his scheduled grand jury appearance, agents from the OAG interviewed Schultz before he testified.  Present for that interview was Attorney Baldwin.  Ms. Baldwin also attended the OAG interview of Tim

Curley that same day. Following these interviews, but before Schultz testified, Ms. Baldwin inquired with a deputy attorney general if Schultz and Curley were targets of the criminal investigation. The prosecutor, Deputy Attorney General Jonelle Eshbach, informed her that they were not targets at that time.[8] *Id*. at 17 (Schultz testified, "And while we were there, Ms. Eshbach came in the room and talked with Ms. Baldwin. And I recall Ms. Baldwin asking her, are my clients a target of the grand jury investigation. And I recall Ms. Eshbach saying not at this time."); *see also id*. at 60 (Ms. Baldwin set forth, "[Ms. Eshbach] said, no, that they weren't targets but I don't know.").

Prior to Schultz's testimony, Judge Barry Feudale, the Grand Jury Supervising Judge, queried Ms. Baldwin regarding her representation of

_____

[8] Despite the OAG's representation that Schultz and Curley were not targets, the OAG was already aware that McQueary had told investigators that he reported a sodomy to Schultz and Curley, and it knew that there had been no follow up police investigation. Thus, at that time, the OAG ostensibly had a basis upon which to charge Curley and Schultz with failure to report suspected child abuse. Hence, this claim was misleading. Moreover, Ms. Baldwin would have been aware that Curley's and Schultz's recollection of what McQueary told them was inconsistent since she was present for both interviews and the testimony of both individuals. Specifically, Schultz acknowledged that the behavior reported to him was sexual in nature, but Curley denied that there was any indication of sexual misconduct. The OAG, outside the presence of Ms. Baldwin, later explicitly told the grand jury supervising judge that Schultz's and Curley's testimony was not consistent. N.T., 4/13/11, at 10.

Schultz and Curley in chambers in their presence. Specifically, the following exchange occurred:

> OAG: Judge, we're here on Notice 29. We have some witnesses to be sworn, Mr. Curley and Mr. Schultz.
>
> Judge Feudale: Represented by?
>
> Ms. Baldwin: My name is Cynthia Baldwin, general counsel for Pennsylvania State University.
>
> Judge Feudale: Will you be providing representation for both of those identified witnesses?
>
> Ms. Baldwin: Gary is retired but was employed by the university and Tim is still an employee.

Notes of Grand Jury Colloquy, 1/12/11, at 7-8. Ms. Baldwin did not expressly state that she represented Schultz solely in an agency capacity, nor did she indicate that she did not represent him in his individual capacity. The OAG did not express concern on the record over a potential conflict of interest based on Ms. Baldwin appearing with both Schultz and Curley. Judge Feudale, without requesting further clarification from Ms. Baldwin, then advised the two men of their rights as grand jury witnesses. In relevant part, he set forth:

> As witnesses before the Grand Jury, you're entitled to certain rights and subject to certain duties which I am now going to explain to you. All of these rights and duties are equally important and it's important that you fully understand each of them.
>
> First, you have the right to the advice and assistance of a lawyer. This means you have the right to the services of a

- 8 -

lawyer with whom you may consult concerning all matters pertaining to your appearance before the Grand Jury.

You may confer with your lawyer at any time before, during and after your testimony. You may consult with your lawyer throughout your entire contact with the Grand Jury. Your lawyer may be present with you in the Grand Jury room during the time you're actually testifying and **you may confer with her** at that time.

You also may at any time discuss your testimony with your lawyer and except for cause shown before this Court, you may disclose your testimony to whomever you choose, if you choose.

You also have the right to refuse to answer any question pending a ruling by the Court directing you to respond if you honestly believe there are proper legal grounds for your refusal. In particular, you have the right to refuse to answer any question which you honestly believe may tend to incriminate you.

Should you refuse to answer any question, you may offer a reason for your refusal, but you're not obliged to do so. If you answer some questions or begin to answer any particular question, that does not necessarily mean you must continue to answer your questions or even complete the answers you have started.

Now, any answers you give to any question can and may be used against you either for the purpose of a Grand Jury Presentment, Grand Jury Report or a Criminal Information.

In other words, if you're uncertain as to whether you may lawfully refuse to answer any question or if any other problem arises during the course of your appearance before the Grand Jury, you may stop the questioning and appear before me, either alone **or in this case with your counsel**, and I will rule on that matter whatever it may be.

*Id*. at 8-10 (emphases added).

Schultz then entered the courtroom with Ms. Baldwin, who was seated beside him during his testimony. At the outset, a deputy attorney general

asked Schultz, "You are accompanied today by counsel, Cynthia Baldwin, is that correct?" N.T., Grand Jury Proceeding, Notice No. 29, 1/12/11, at 3. Schultz answered, "That is correct." *Id*. Ms. Baldwin did not indicate at that time that she represented Schultz solely in an agency capacity due to his prior employment at Penn State or that she was not representing him in a personal capacity. The Commonwealth proceeded to question Schultz about the 1998 and 2001 incidents. He testified as follows.

Schultz stated that he was present for a meeting with Paterno and Curley regarding the 2001 incident, *id*. at 5, as well as a later meeting with McQueary. *Id*. at 9. Schultz related that, at the meeting involving Paterno and Curley, Paterno told them that he had been informed by a graduate student of disturbing and inappropriate behavior by Sandusky in the shower. *Id*. Schultz maintained that it was reported that Sandusky had inappropriately grabbed the young boy's genitals. *Id*. at 10. Nonetheless, Schultz did not consider the allegations to be too serious and expressly denied that he had ever been told that Sandusky engaged in anal intercourse with the victim. *Id*.

Curley and Schultz did not report the matter to police. However, they did agree to instruct Sandusky that he was not permitted to bring children from the Second Mile into the football building. *Id*. at 11. Nevertheless, no other University official, outside of then-Penn State President, Dr. Graham Spanier, was told of this edict. Schultz also believed that they requested the

county child protection agency to investigate; *id*.; *see also id*. at 14, however, no investigation by that agency ensued. Schultz and Curley both reported to Spanier that an allegation against Sandusky regarding inappropriate behavior with a young child in the showers of the football building was reported by a Penn State employee. *Id*. at 17. The Second Mile was also told of the incident, but not that Sandusky was witnessed committing sodomy.

Schultz admitted that he did not attempt to learn of the identity of the young boy involved in the 2001 matter. *Id*. at 14. In addition, he was also questioned about notes and documents that he possessed that involved Sandusky as follows:

> OAG: Do you believe that you may be in possession of any notes regarding the 2002 incident that you may have written memorializing what occurred?[9]
>
> Mr. Schultz: I have none of those in my possession. I believe that there were probably notes taken at the time. Given my retirement in 2009, if I even had them at them at that time, something that old would have probably been destroyed. I had quite a number of files that I considered confidential matters that go back years that didn't any longer seem pertinent. I wouldn't be surprised. In fact, I would guess if there were any notes, they were destroyed on or before 2009.

---

[9] At the time, the Commonwealth referred to the 2001 shower crime as occurring in 2002.

*Id*. at 16.[10] Schultz also expressed surprise upon learning that local police had investigated the 1998 incident and generated a 95-page police report. He submitted that there was no indication that a crime occurred in 1998.

On November 7, 2011, the Commonwealth charged Schultz with one count each of perjury and failure to report suspected child abuse. Schultz thereafter retained private counsel, and notified Ms. Baldwin, who had retained her own attorney, via letter that Schultz considered Ms. Baldwin to have been his personal attorney and that he did not waive any claim of attorney-client privilege. That letter also directed Ms. Baldwin and her attorney to invoke the attorney-client privilege if questioned by the OAG, the United States Attorney General for the Middle District, and the Freeh Group, an entity hired by Penn State to perform an internal investigation into its handling of the Sandusky matters. Subsequently, on December 16, 2011, the Commonwealth conducted a preliminary hearing against Schultz with respect to the charges of perjury and failure to report. Ms. Baldwin did not testify. The crimes were held for court and the Commonwealth filed a criminal information on January 19, 2012.

---

[10] Notes were eventually discovered in Schultz's Penn State office pertaining to Sandusky after Schultz returned to work for Penn State in his previous position. Schultz did not turn those documents over to the OAG.

Meanwhile, the OAG, in December of 2011, had expressed significant frustration with Ms. Baldwin's failure to comply with its document subpoena request and threatened the University and ostensibly her with possible contempt of court "and any other appropriate measures applicable to obstruction against the institution and those individuals responsible for these decisions." Letter from OAG to Ms. Baldwin, 12/19/11, at 2.[11]

_____

[11] Although the University was charged with complying with Subpoena 1179 in December 2010, it was not until April 2012 that relevant documents were turned over. Notably, although Ms. Baldwin informed University President, Dr. Graham Spanier, of the subpoena and asked if he, Schultz, and Curley had any documents, she apparently did not follow University protocol in ensuring compliance with that subpoena. A grand jury report observed that an "investigation into whether the University fully complied with the subpoena determined that no effort was made to search the Athletic Department, where Sandusky had been employed for over 30 years, or to search any of the electronically stored data at the University or emails or other documents[.]" Grand Jury Presentment No. 29, at 23. The Grand Jury further concluded,

> Penn State had in place a well-defined historical practice and procedure for responding to subpoenas. Subpoenas that might encompass electronically stored data (such as emails and documents stored on a computer or network drive) would routinely be sent to the specialized unit called the "SOS." These information technology professionals were trained and dedicated to assembling responsive electronically stored data in response to litigation needs or other legal process. None of the SOS professionals were ever shown subpoena 1179, nor were they directed to seek any information requested by subpoena 1179 before the arrests of Sandusky, Schultz, and Curley.

*Id*.

*(Footnote Continued Next Page)*

- 13 -

Subsequently, the Commonwealth and Ms. Baldwin entered into discussions about her testifying before the grand jury regarding the responses of Schultz, Curley, and Spanier pertaining to her document requests related to Sandusky. *See* N.T., Grand Jury Conference, 10/22/12, at 2 ("the Office of Attorney General has been conversing with Cynthia Baldwin's counsel and eventually Cynthia Baldwin in the context of a proffer discussion.").

On June 22, 2012, Ms. Baldwin, through her counsel, responded to Schultz's invocation of the attorney-client privilege. She asserted that she was counsel for Penn State, that she had acted solely in an agency capacity in representing Schultz, and that she did not represent him in an individual capacity before the grand jury. In correspondence, Schultz again invoked his attorney-client privilege to Judge Feudale and Ms. Baldwin, and copied the letter to the OAG and counsel for Penn State.

New general counsel for Penn State, Michael Mustokoff, asked Judge Feudale for a conference concerning privilege concerns before Ms. Baldwin

_(Footnote Continued)_ ─────────────────

Ms. Baldwin did assert in her grand jury testimony that she relied on the Athletic Department, the President's office, and Vice President's office to comply with the subpoena. Ms. Baldwin also informed the supervising grand jury judge in April of 2011 that she "had the IT people—I've been pushing the IT people and I believe that we can cull those [documents] out for you, that we can do all of those." N.T., 4/13/11, at 27. However, the grand jury report reveals that, in addition to the SOS unit, other individuals employed in the Penn State information technology department maintained that they were not asked to locate such documents. Grand Jury Presentment No. 29, at 23-24.

- 14 -

testified before the grand jury on October 22, 2012. Mr. Mustokoff agreed that Penn State waived the privilege for itself, but explicitly declined to waive the University's privilege as to communications between Ms. Baldwin and Schultz. Specifically, Mr. Mustokoff wrote,

> We have waived the University's privilege as to those documents with two critical exceptions:
>
> . . .
>
> (2) any communications between Justice Baldwin and Messrs. Schultz and Curley. We have previously shared our concerns about the Schultz/Curley communications with you and memorialized them in our October 2, 2012 letter to Judge Feudale.

Letter from Michael Mustokoff to Chief Deputy Attorney General Frank Fina, 10/19/12, at 1.

In preparation for Ms. Baldwin's grand jury appearance, Judge Feudale conducted a conference with counsel for Penn State, the OAG, and Ms. Baldwin's attorney on October 22, 2012. Schultz's attorney was not permitted to attend. Counsel for Penn State astutely noted that it could not waive any privilege that Schultz might have and again declined to waive its privilege as to communications between Ms. Baldwin and Schultz. The OAG, through Attorney Frank Fina, submitted at that time that it would not question Ms. Baldwin about matters that could involve potential confidential communications between Schultz and Ms. Baldwin. Attorney Fina expressly set forth,

- 15 -

But at this point, Your Honor, we are willing to put Miss Baldwin in the grand jury without addressing any of the issues related to the testimony of Mr. Schultz and Mr. Curley and conversations she had with them about that testimony and put that—put those matters on hold until we get a Court determination regarding the privilege and we can address that later on.

N.T., Grand Jury Conference, 10/22/12, at 6.[12]  Shortly thereafter, Attorney Fina declared, "There may well be [privilege] claims down the road by [counsel for Schultz and Curley], and perhaps even counsel for Graham Spanier; but that is, you know, the risk that the Commonwealth is ready to bear because we believe that we are soundly within the [University] waiver." *Id*. at 11.

Judge Feudale, relying on the representations of Attorney Fina, stated,

I'm satisfied based on what you placed on the record that [Ms. Baldwin] is clearly able to proceed on testimony with the stipulation that you communicated that you're not going to get into an inquiry as to her representation and what that meant

_____

[12]  Pa.R.Prof.Conduct 3.10 precludes a prosecutor from subpoenaing an attorney to appear before a grand jury where the prosecutor is seeking to compel the attorney to provide evidence regarding a person who is or has been represented by the attorney.  The rule reads in its entirety,

A public prosecutor or other governmental lawyer shall not, without prior judicial approval, subpoena an attorney to appear before a grand jury or other tribunal investigating criminal activity in circumstances where the prosecutor or other governmental lawyer seeks to compel the attorney/witness to provide evidence concerning a person who is or has been represented by the attorney/witness.

Pa.R.Prof.Conduct 3.10.

with regard to Mr. Curley, Mr. Schultz, and perhaps, as you said, also Mr. Spanier.

*Id*. at 11-12.[13]

Despite the foregoing representations by Mr. Fina, a number of the Commonwealth's questions to Ms. Baldwin before the grand jury precisely implicated potential confidential communications.[14]  According to Ms. Baldwin's grand jury testimony, Schultz told her prior to his testimony that he did not have any documents relating to the 1998 and 2001 Sandusky matters. The Commonwealth specifically inquired of Ms. Baldwin,

> OAG:  Did they [Schultz, Curley, and Spanier] ever in any way, shape, or form disclose to you when you were asking them for this material anything about 1998 or 2001 and the existence of e-mails from those events?
>
> Ms. Baldwin:  Never.
>
> OAG:  We also know that Mr. Schultz had a file regarding Jerry Sandusky in his office; and that in that file were documents related to his retirement agreement.

---

[13] The Commonwealth did not raise any argument that Ms. Baldwin could testify regarding any privileged communications as a result of the crime-fraud exception to the attorney-client privilege. *See In re Investigating Grand Jury of Philadelphia County*, 593 A.2d 402, 406-07 (Pa. 1991) (crime-fraud exception excludes from protection those communications between an attorney and client that are made for the purpose of committing a crime or fraud).

[14]  In light of Attorney Fina's representation to Judge Feudale, and mindful of Pa.R.Prof.Conduct 3.10, we find his subsequent questioning of Ms. Baldwin, absent prior judicial approval on the privilege question, to be highly improper.

> There were drafts and other documents related to his employment and his retirement and then there were handwritten notes and e-mails pertaining to the 1998 crimes of Mr. Sandusky and the 2001 crimes of Mr. Sandusky.
>
> Again, same question, did he ever reveal to you the existence of that Sandusky file or any of its contents?
>
> Ms. Baldwin: Never. He told me he didn't have anything.

N.T., 10/26/12, at 20. These inquiries related to compliance with the subpoena *duces tecum* and directly incriminated Schultz in the commission of the crime of obstruction of justice.

Following Ms. Baldwin's testimony, that same day, in a second presentment, the grand jury recommended additional charges against Schultz for obstruction of justice and conspiracy. The Commonwealth filed a second criminal complaint against Schultz on November 1, 2012, alleging that Schultz committed the crimes of EWOC, obstruction of justice, and conspiracy to commit obstruction of justice, conspiracy to commit perjury, and conspiracy to commit EWOC. It also consolidated Schultz's cases with prosecutions against Curley and Spanier.

Preliminary hearings for Schultz, Curley, and Spanier were held on July 29, 2013 and July 30, 2013. Again, Ms. Baldwin did not testify. The magisterial district court determined that a *prima facie* case existed against Schultz and the case proceeded to the court of common pleas. Schultz filed pre-trial motions to preclude Ms. Baldwin's testimony due to a breach of the attorney-client privilege, to quash the second grand jury presentment, and

to suppress his own grand jury testimony and dismiss those charges that arose out of that testimony due to a lack of representation at the grand jury proceeding.

The court conducted a hearing on December 17, 2013. In support of his pre-trial motions, Schultz sought to call Mr. Fina, Ms. Baldwin, and expert witnesses to testify regarding Ms. Baldwin's deficient representation. The trial court precluded those witnesses from testifying. After receipt of memoranda from the parties, the court conducted additional hearings on November 20-21, 2014, to consider testimony regarding the scope of the alleged attorney-client privilege between Ms. Baldwin and Schultz, Curley, and Spanier. The court precluded testimony from all witnesses except Ms. Baldwin and the three defendants. It also prevented Schultz and his counsel from being present during the testimony of his co-defendants. Ms. Baldwin, however, was present for the testimony of all three men and testified after each of them testified.

Thereafter, in an order entered on January 14, 2015, the trial court concluded that Schultz was not denied counsel during his grand jury testimony on January 12, 2011, because Ms. Baldwin represented him as an agent of Penn State. It further held that Ms. Baldwin did not represent Schultz in an individual capacity, and that therefore her subsequent testimony did not violate the attorney-client privilege.

Schultz filed this interlocutory appeal, raising three issues for our review.

I. Whether the appropriate standard for determining if a witness, subpoenaed to testify before a Pennsylvania Grand Jury and therefore entitled to the assistance of counsel, is represented by counsel is the putative client's reasonable belief?

II. Whether the agency counsel relationship contemplated by the trial court provide sufficient protection of the Grand Jury Act's right to counsel and the right against self-incrimination inherent in the Act and in Article I, Section 9 of the Pennsylvania Constitution?

III. Whether Ms. Baldwin's grand jury testimony violated Mr. Schultz's attorney-client privilege, requiring quashal of the charges that depend on her testimony and preclusion of such testimony in any future proceedings?

Appellant's brief at 4.

We note that each of Appellant's issues and arguments as well as the response by the Commonwealth are intertwined. Therefore, we will address Schultz's positions together. However, before discussing the merits of Schultz's claims, we must first address our jurisdiction.

**Part II. Jurisdiction**

Ordinarily, this Court possesses jurisdiction to hear appeals from final orders. In limited circumstances, however, we may consider interlocutory appeals. One type of interlocutory appeal is that involving a collateral order. Pursuant to Pa.R.A.P. 313, an "appeal may be taken as of right from a collateral order of an administrative agency or lower court." Pa.R.A.P.

- 20 -

313(a). Rule 313 further defines a collateral order as an order "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b).

The Pennsylvania Supreme Court has applied the collateral order doctrine to permit interlocutory review in matters concerning attorney-client privilege under various circumstances. *See In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 209 (Pa. 2014); *Commonwealth v. Harris*, 32 A.3d 243, 251 (Pa. 2011); *Ben v. Schwartz*, 729 A.2d 547 (Pa. 1999). In *Harris*, *supra*, a case involving a PCRA appeal, our state High Court expressly rejected a contrary United States Supreme Court decision,[15] stating, "we reaffirm our position in *Ben* that once material has been disclosed, any privilege is effectively destroyed. Privileges exist as a rule to promote frank discussions, and we respectfully disagree with the United States Supreme Court that disallowing immediate appeals will not chill such discussions." *Harris*, *supra* at 249.

The first aspect of the collateral order doctrine, separability, exists where consideration of the order at issue "does not implicate the merits of the underlying dispute." *Commonwealth v. Wright*, 78 A.3d 1070, 1077

---

[15] *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009).

(Pa. 2013).  In the instant case, the order is separable from the main action because it does not require a merits analysis of the underlying criminal allegations.  Whether Schultz is guilty of the offenses charged is independent of his attorney-client privilege claim.  Accordingly, the separability factor is easily met.

The second consideration under the collateral order paradigm is whether the interests involved are too important to be denied review.  Here, the order permits the disclosure of communications between an attorney and an individual who asserts that he was a client for purposes of criminal prosecution.  Protection of the attorney-client privilege, in conjunction with the scope of representation to be afforded an individual testifying before a criminal investigating grand jury, involve rights deeply rooted beyond this case.  *See Commonwealth v. Sandusky*, 70 A.3d 886 (Pa.Super. 2013).  It is well-settled that the attorney-client privilege is one of the most sacrosanct privileges that exists.  Pointedly, it is at the heart of the American judicial system.  As our Supreme Court noted in *Hall*, *supra*, "even where the privilege issue is not 'controlling,' or where an immediate appeal will not materially advance the end of the case, the frank discussions that privileges are meant to protect will be chilled if the opportunity for immediate correction by an appellate court is not available.  *Harris*, *supra* at 250.  Here, the privilege question presented not only involves the deeply rooted

attorney-client privilege, but addressing the matter will materially advance the case. The importance criteria is thus satisfied.

Finally, any privilege claim will be lost, the third requirement for a collateral order, if Ms. Baldwin is permitted to testify regarding communications with Schultz. In this respect, the **Harris** Court opined, "A rule requiring parties to wait until final judgment to appeal an order overruling a claim of privilege would both cause the privilege-holder's fears to be realized and deprive the privilege-holder of any meaningful remedy." **Id**. at 249. Accordingly, we have jurisdiction to consider Schultz's claim that his communications with Ms. Baldwin were privileged, which necessarily encompasses the scope of Ms. Baldwin's representation.

To the extent that Schultz also argues that he was deprived of his statutory right to grand jury counsel based on Ms. Baldwin's insistence that she did not represent him personally, we find that this position is inextricably intertwined with the question of the scope of Ms. Baldwin's representation and whether an attorney-client privilege exists. We recognize that Pa.R.A.P. 313 must be narrowly applied on an issue-by-issue basis. **See Rae v. Pennsylvania Funeral Directors Association**, 977 A.2d 1121, 1129 (Pa. 2009). In this regard, whether a person has been constructively denied his or her statutory right to grand jury counsel, under the facts herein, presents an issue of first impression as to whether it falls within the ambit of the collateral order doctrine.

First, the question is separable from the issue of Schultz's guilt. ***See*** Pa.R.A.P. 313(b); ***Wright***, ***supra***. The right to personal counsel at a grand jury proceeding is completely independent of whether Schultz committed the crimes alleged. We need not consider the underlying allegations in reviewing whether Appellant was entitled to personal representation during his grand jury testimony rather than the agency representation afforded by Ms. Baldwin.

The second prerequisite to collateral order review, whether the interests are too important to deny consideration, is also met. The interest involved is the alleged denial of the right to counsel before a grand jury. In affording the right to counsel inside the grand jury room, our legislature sought to offer greater protections to individuals' constitutional right against self-incrimination when appearing in the grand jury setting. Both the right to counsel and the constitutional right against self-incrimination are foundational interests. ***See*** 42 Pa.C.S. § 4549(c); Pa.Const. Art. I, § 9.

The statutory right to counsel at a grand jury proceeding and the concomitant right that counsel is intended to protect, the right against self-incrimination, are, like the right to confrontation, of vital importance. ***See Commonwealth v. McCloskey***, 277 A.2d 764, 780 (Pa. 1971) (Eagan, J., concurring and dissenting) ("I cannot see how an untrained layman can be expected to possibly discern whether or not an answer to a particular question will subject him to the danger of incrimination. To deny him the

opportunity of adequate consultation with his counsel is to render his right under the Fifth Amendment meaningless."); *Id*. ("A potential defendant who is brought before the Grand Jury without an attorney at his side is almost helpless. He is faced with a barrage of questions, often improper in the normal judicial setting, thrown at him by a group of reasonably intelligent citizens excited at the prospect of playing both lawyer and detective. This torrent of interrogation is, of course, directed by a skilled prosecutor capable of utilizing the Grand Jury as the tool to obtain incriminating evidence from the mouth of a nervous witness. The upset and confused witness does not know whether to respond to the questions and risk having his answers used against him at a trial or claim the Fifth Amendment, creating suspicion in the eyes of the jurors and risking a contempt charge. In this atmosphere, the proceeding takes on the attributes of a Star Chamber.").

Moreover, the second criterion is inextricably intertwined with the final aspect of the collateral order doctrine in this case. After all, a right without a remedy is meaningless. Here, if review was postponed until after trial, the claim would be irreparably lost both in light of the privilege issues in play and because there is no effective mechanism for attacking the constructive denial of counsel at a grand jury proceeding on direct appeal.[16]

_____

[16] We note that Schultz filed with the trial court a motion to certify its order under 42 Pa.C.S. § 702(b), to allow an interlocutory appeal by permission
*(Footnote Continued Next Page)*

In this latter respect, we point out that claims regarding pre-trial matters at preliminary hearings have traditionally been held to be immaterial after trial. *See Commonwealth v. Ricker*, 120 A.3d 349, 353 (Pa.Super. 2015) (citing *Commonwealth v. Sanchez*, 82 A.3d 943, 984 (Pa. 2013) (finding that absence of counsel at preliminary hearing did not warrant relief after conviction); *Commonwealth v. Tyler*, 587 A.2d 326 (Pa.Super. 1991)). In *Ricker*, this Court was faced with deciding whether an appeal from a denial of a pre-trial *habeas corpus* motion was properly before us. Although the case did not discuss the collateral order doctrine, we noted the importance of the constitutional right being invoked, the right of confrontation during a preliminary hearing, and that the question of whether the defendant's pre-trial rights were infringed was capable of evading review if we awaited a final order. We found exceptional circumstances warranted the exercise of jurisdiction. *See also Commonwealth v. Kilgallen*, 108 A.2d 780 (Pa. 1954) (exceptional circumstances warranted review of interlocutory appeal from denial of motion to quash grand jury presentment based on alleged infringement of defendant's right against self-incrimination).

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯

with other issues pertaining to the attorney-client relationship. The trial court denied that motion. Schultz, subsequent to the filing of this appeal, petitioned this Court for review under Pa.R.A.P. 1311, however, the Court denied that petition.

In light of **Sanchez**, **supra**, where our Supreme Court determined that the lack of counsel at a preliminary hearing could not compel reversing a finding of guilt after trial, despite the United States Supreme Court holding that there is a Sixth Amendment right to counsel during a preliminary hearing, **see Coleman v. Alabama**, 399 U.S. 1 (1970), failing to address the right to grand jury counsel could result in the claim being lost. We recognize that counsel serves different purposes at a grand jury proceeding and a preliminary hearing. However, the Commonwealth maintained below that Appellant's claim regarding the constructive denial of counsel cannot be remedied during a direct appeal, and must await collateral review under the Post-Conviction Relief Act ("PCRA"). This is consistent with our Supreme Court's directive that claims of ineffective assistance of counsel generally must await PCRA review. **Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002); **Commonwealth v. Holmes**, 79 A.3d 562 (Pa. 2013). Similarly, this Court has held in situations where trial counsel was present, but the defendant's claim was that counsel's representation before trial was so deficient as to result in a constructive denial of counsel, that such a claim must await post-conviction review. **Commonwealth v. Britt**, 83 A.3d 198, 201 (Pa.Super. 2013) (finding that although the defendant's argument was that counsel was *per se* ineffective, his claim more properly fell under the traditional ineffectiveness paradigm and had to be deferred to PCRA proceedings).

Nevertheless, while claims of *per se* trial counsel ineffectiveness, including the constructive denial of counsel, may be remedied via a PCRA petition, the language of that statute applies to the truth-determining process for adjudications of guilt and extends to proceedings where there is a federal Sixth Amendment or Article I, § 9 Pennsylvania constitutional right to counsel. ***Commonwealth ex rel. Dadario v. Goldberg***, 773 A.2d 126, 130 (Pa. 2001) ("the language 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place" merely represents a statutory adoption of the prejudice standard for Sixth Amendment ineffective assistance of counsel claims . . . .Therefore, if a petitioner claims that he or she was denied the effective assistance of counsel in violation of the Sixth Amendment and Article I, Section 9 of the Pennsylvania Constitution, Section 9543(a)(2)(ii) of the PCRA allows the petitioner to seek relief."). However, there is no Sixth Amendment right to counsel at an investigative grand jury hearing, ***In re Groban's Petition***, 352 U.S. 330, 333 (1957), nor does that hearing involve a proceeding essential to either a guilt or sentencing determination, or an appeal therefrom. ***See generally*** 42 Pa.C.S. § 9543 (defining eligibility for post-conviction relief).

While there may exist a constitutional due process right to counsel at a grand jury proceeding, in so far as there exists a statutory right to counsel, a question still arises as to whether the PCRA was intended to remedy a

constructive denial of counsel during an investigative grand jury proceeding. ***But see Goldberg***, ***supra*** at 130 ("all constitutionally-cognizable claims of ineffective assistance of counsel may be reviewed in a PCRA petition"); ***Commonwealth v. Masker***, 34 A.3d 841 (Pa.Super. 2011) (*en banc*) (Bowes, J., concurring and dissenting); ***but compare Masker***, ***supra***.

In ***Masker***, a majority of this Court held that the statutory right to sexually violent predator ("SVP") hearing counsel did not result in an ineffectiveness claim relative to SVP counsel that was cognizable under the PCRA. There, counsel was representing the defendant during a joint sentencing and SVP hearing. Unlike a grand jury proceeding, sentencing is actually considered a critical stage of a "criminal prosecution" as that phrase is used in the constitutional context. ***Commonwealth v. D'Amato***, 856 A.2d 806, 821 (Pa. 2004). The ***Masker*** majority concluded that because the claim did not challenge the defendant's guilt, the PCRA did not provide an avenue of relief. Similar to this matter, where there is also a statutory right to grand jury counsel, there existed in that case a statutory right to SVP counsel. Although the ***Masker*** Court premised its holding on the collateral consequences doctrine, *i.e.*, sex offender registration being a collateral consequence of a conviction, ***Masker*** still renders it uncertain whether Schultz can pursue PCRA review based on inadequate representation at a grand jury proceeding. This is because grand jury proceedings are not constitutionally considered part of a criminal prosecution and are not part of

the truth-determining process for ascertaining guilt, prerequisites for cognizability under the PCRA.

Moreover, in the civil context, our Supreme Court in discussing the irreparable loss aspect of the collateral order doctrine, has opined that the substantial costs an appellant will incur in going to trial in complex civil litigation can be a factor that is to be weighed. *Pridgen v. Parker Hannifin Corp.*, 905 A.2d 422, 433 (Pa. 2006). Here, Schultz is likely to incur significant costs proceeding to trial and, if convicted, obloquy, and a substantial loss of liberty. Collateral appeals have also been permitted where the right involved protects an individual from going to trial in the double jeopardy area and claims involving the speech and debate clause of the federal constitution. *Abney v. United States*, 431 U.S. 651, 660-62 (1977) (double jeopardy) *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (Pa. 1977) (plurality opinion) (double jeopardy); *Helstoski v. Meanor*, 442 U.S. 500, 506-08, (1979) (Speech or Debate Clause). Further, if convicted, based on the Commonwealth's own position, Schultz will have to undergo a direct appeal, and if unsuccessful, then seek post-conviction relief before his statutory right to counsel claim can be determined. Indeed, part of the purpose of the collateral order doctrine, to avoid piecemeal litigation, would actually be undermined if we did not consider the intertwined arguments relative to counsel's representation in conjunction with the attorney-client privilege issue. For all of the

aforementioned reasons, we find that we have jurisdiction over the claims advanced in this appeal.

## Part III.  Standard and Scope of Review and General Principles Governing Attorney-Client Privilege Questions

An issue concerning whether a communication is protected by the attorney-client privilege presents a question of law.  ***In re Thirty-Third Statewide Investigating Grand Jury***, ***supra*** at 215.  Hence, our standard of review is *de novo* and our scope of review is plenary.  ***Id***.  "Although now embodied in statute, the attorney-client privilege is deeply rooted in the common law.  Indeed, it is the most revered of the common law privileges."  ***Commonwealth v. Chmiel***, 738 A.2d 406, 414 (Pa. 1999) (internal citations omitted).  In a criminal matter, "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client."  42 Pa.C.S. § 5916.

This Court has opined, "Where legal advice of any kind is sought from a professional legal adviser in his capacity as such the communications relating to the purpose made in confidence by the client are at this instance permanently protected from disclosure by himself or by the legal adviser except the protection may be waived."  ***In re Gartley***, 491 A.2d 851,

858 (Pa.Super. 1985) (quoting 8 Wigmore, Evidence §§ 2292 at 554 (McNaughton rev. 1961)). Almost a century ago, our Supreme Court posited,

> the circle of protection is not so narrow as to exclude communications, a professional person may deem unimportant to the controversy, or the briefest and lightest talk the client may choose to indulge with his legal adviser, provided he regards him as such at the moment. To found a distinction on such a ground, would be to measure the safety of the confiding party by the extent of his intelligence and knowledge, and to expose to betrayal these very anxieties which prompt those in difficulty to seek the ear of him in whom they trust, in season and out of season. The general rule is, that all professional communications are sacred.

***Alexander v. Queen***, 253 Pa. 195, 203 (Pa. 1916). More recently, our Supreme Court declared,

> The purposes and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosure to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. **To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance**. **Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged**; -- that the attorney shall not be permitted, without the consent of his client, -- and much less will he be compelled -- to reveal or disclose communications made to him under such circumstances." 2 Mecham on Agency, 2d Ed., § 2297.

*Commonwealth v. Maguigan*, 511 A.2d 1327, 1333-1334 (Pa. 1986) (emphasis added). Our Supreme Court has further opined,

> Recognizing that its purpose is to create an atmosphere that will encourage confidence and dialogue between attorney and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process. *Estate of Kofsky*, 487 Pa. 473, 409 A.2d 1358 (1979). The intended beneficiary of this policy is not the individual client so much as the systematic administration of justice which depends on frank and open client-attorney communication. *In re Search Warrant B-21778*, 513 Pa. 429, 521 A.2d 422, 428 (1987); *Estate of Kofsky*, *supra*.

*In re Investigating Grand Jury No. 88-00-3505*, 593 A.2d 402 (Pa. 1991). In addition, "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011).

The attorney-client relationship exists not only in one-on-one situations between an individual and an attorney, but it can also exist in a corporate environment in which general counsel or legal staff is present. "When the client is a corporation, the privilege extends to communications between its attorney and agents or employees authorized to act on the corporation's behalf." *In re Condemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d 391, 396 (Pa.Cmwlth. 2009) (citing *Upjohn Co. v. United States,* 449 U.S. 383 (1981)). In *Upjohn*, the United States Supreme Court analyzed the scope of the attorney-client privilege when the

client is a corporation. Although **Upjohn** itself did not involve warnings or a discussion of a lawyer's explanation regarding the scope of his representation, the Supreme Court observed that, under certain situations, information about the extent of the attorney-client relationship between a corporate counsel and an employee might be necessary. As a result of that case, "**Upjohn** warnings" have evolved that specifically inform a corporate employee that corporate counsel represents the corporation and not the individual, and that the corporation possesses the attorney-client privilege. **See** Grace M. Giesel, *Upjohn* Warnings, the Attorney-Client Privilege, and Principles of Lawyer Ethics: Achieving Harmony, 65 U. Miami L. Rev. 109, 110-111 (Fall 2010).[17]

---

[17] In 2009, the American Bar Association, via its White Collar Crime Committee, issued a report entitled "UpJohn Warnings: Recommended Best Practices When Corporate Counsel Interacts with Corporate Employees." The report set forth that, at a minimum, counsel should provide a warning before the interview and that the warning should be explicit and unambiguous. The report maintained that if an attorney knowingly obtained confidential information and then gave legal advice or provided legal services, an attorney-client relationship existed. It continued that counsel may also have a duty of confidentiality with a corporate employee because the employee could be viewed as a prospective client. In that scenario, if the employee reasonably believed he was seeking legal advice regarding to his personal interests, a duty of confidentiality could arise. A portion of the suggested **UpJohn** warning provided:

> I am a lawyer for or from Corporation A. I represent only Corporation A, and I do not represent you personally.
> . . . .

*(Footnote Continued Next Page)*

In addition to the traditional attorney-client relationship and the corporate environment, the attorney-client privilege also can exist in the context of co-defendants and their attorney or attorneys. When multiple defendants and their counsel engage in a common defense, the privilege is not waived by the sharing of confidential information among the parties for the benefit of the joint defense. *See Commonwealth v. Scarfo*, 611 A.2d 242 (Pa.Super. 1992), *superseded by statute on other ground as stated in* ***Commonwealth v. Buck***, 709 A.2d 892 (Pa. 1998); ***see also*** Pa.R.Prof.Conduct 1.6(a).

### Part V.  The Grand Jury in Pennsylvania and the Advent of the Statutory Right to Grand Jury Counsel

Underlying Schultz's claims is the extent and scope of Ms. Baldwin's representation of him prior to and during his testimony before a criminal investigating grand jury. Therefore, we begin our consideration of Schultz's issues with a brief discussion of the evolution of the grand jury in

*(Footnote Continued)* ————————

Your communications with me are protected by the attorney-client privilege. But the attorney-client privilege belongs solely to Corporation A, not you. That means that Corporation A alone may elect to waive the attorney-client privilege and reveal our discussion to third parties. Corporation A alone may decide to waive the privilege and disclose this discussion to such third parties as federal or state agencies, at its sole discretion, and without notifying you.

Upjohn Warnings: Recommended Best Practices when Corporate Counsel Interacts with Corporate Individuals, 2009 A.B.A. Sec. Crim. Just., at 3.

Pennsylvania. The grand jury is an ancient mode of procedure. ***Appeal of Hamilton***, 180 A.2d 782, 790 (Pa. 1962) (Bell, C.J., dissenting). The Pennsylvania Supreme Court has opined that the grand jury became formalized in England in 1162. ***McCloskey***, ***supra*** at 772 n.21. In ***McNair's Petition***, 187 A. 498, 502 n.1 (Pa. 1936), our High Court posited that the origins of the English grand jury has been attributed "to the Saxon Kings, particularly to Ethelred in the tenth century, and others to William the Conqueror, or his followers, in the eleventh century." English grand juries "originally decided matters in accordance with their personal knowledge or their knowledge of neighborhood affairs. Later, they summoned witnesses, investigated persons and conditions, made reports to the sovereign, and gradually became an indicting grand jury." ***Appeal of Hamilton***, ***supra*** at 790.

The Pennsylvania Constitution of 1776 did not contain an express requirement that a grand jury indictment be used to begin criminal proceedings;[18] however, in 1790, a clause was added to the Pennsylvania Declaration of Rights requiring grand jury indictments to institute most

---

[18] The original Pennsylvania charter did refer to grand jury indictments. Specifically, in § 27 of Chapter II, the Pennsylvania Constitution read, "All prosecutions shall commence in the name and by the authority of the freemen of the commonwealth of Pennsylvania; and all indictments shall conclude with these words, '*Against the peace and dignity of the same*.' The stile of all process hereafter in this state shall be, The commonwealth of Pennsylvania."

criminal proceedings. Article 9, § 10 of the 1790 charter read in pertinent part, "That no person shall, for any indictable offence, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger, or, by leave of the court, for oppression and misdemeanor in office." James Wilson, an influential framer of both the federal constitution and 1790 Pennsylvania Constitution remarked of the grand jury, "among all the plans and establishments which have been devised for securing the wise and uniform execution of the criminal laws, the institution of grand juries holds the most distinguished place." *See Hurtado v. People of State of California*, 110 U.S. 516, 555 (1884) (Harlan, J., dissenting) (quoting 3 Wilson's Works).

The current Pennsylvania Constitution was amended to allow for the frequent use of criminal informations. Hence, the typical manner of instituting a criminal prosecution is no longer via a grand jury indictment. Nevertheless, an investigating grand jury, as compared to an indicting grand jury, is still an important part of Pennsylvania law.[19] Historically, a witness before a Pennsylvania grand jury did not have the right to have an attorney

---

[19] The Pennsylvania Supreme Court recently promulgated a criminal procedural rule reinstituting the usage of criminal indicting grand juries in cases involving witness intimidation. *See* Pa.R.Crim.P. 556 (adopted in 2012).

present during his or her grand jury testimony. *McCloskey*, *supra*; *see also In re Groban's Petition*, *supra*. That changed in 1980 with the adoption of the Investigating Grand Jury Act. That Act reads in salient part,

**(c) Counsel for witnesses.--**

(1) **A witness subpoenaed to appear and testify before an investigating grand jury or to produce documents, records or other evidence before an investigating grand jury shall be entitled to the assistance of counsel, including assistance during such time as the witness is questioned in the presence of the investigating grand jury**. In the event counsel of the witness' choice is not available, he shall be required to obtain other counsel within a reasonable time in order that the work of the grand jury may proceed.

(2) **Such counsel** may be retained by the witness or **shall be appointed in the case of any person unable to procure sufficient funds to obtain legal representation**.

(3) **Such counsel shall be allowed to be present in the grand jury room during the questioning of the witness and shall be allowed to advise the witness** but shall make no objections or arguments or otherwise address the grand jury or the attorney for the Commonwealth. The supervising judge shall have the same power to remove such counsel from the grand jury room as a judge has with respect to an attorney in any court proceeding. Violation of this paragraph shall be punishable as contempt by the supervising judge.

(4) **An attorney**, or attorneys who are associated in practice, **shall not continue multiple representation of clients in a grand jury proceeding if the exercise of the independent professional judgment of an attorney on behalf of one of the clients will or is likely to be adversely affected by his representation of another client**. If the supervising judge determines that the interest of an individual will or is likely to be adversely affected, he may order separate representation of witnesses, giving appropriate weight to the right of an individual to counsel of his own choosing.

42 Pa.C.S. § 4549(c) (emphases added).

Thus, the Grand Jury Act provides a right to counsel during the grand jury proceeding itself. The supervising judge is charged with deciding whether the witness's interest will be adversely affected by an attorney representing multiple clients. The provision that an attorney is allowed to be present with his or her client during the individual's testimony was added because witnesses are confronted with "important and complex legal issues." H.R. 1319, 162nd Gen. Assem. Sess. 1978, at 3162 (sponsor of applicable amendment to Grand Jury Act opining on the addition of permitting counsel to attend grand jury proceeding).

### Part VI.  Parties' Arguments

Schultz begins by pointing out that the Investigating Grand Jury Act guarantees a statutory right to counsel during the witness's grand jury testimony. He maintains that because there is a statutory right to counsel, there exists a right to effective assistance of such counsel. According to Schultz, "the usual obligations of effective counsel – zealous and competent representation, loyalty, and protection for the confidentiality of work product and privileged communications – define the type of counsel to which a witness is entitled under the Grand Jury Act." Appellant's brief at 26; **Commonwealth v. Albrecht**, 720 A.2d 693, 699-700 (Pa. 1998) (rule based right to PCRA counsel includes right to effective assistance of counsel); **see also Masker**, **supra** (Bowes, J., concurring and dissenting)

(statutory right to sexually violent predator hearing counsel includes right to effective counsel).

Continuing, Schultz suggests that only a witness's counsel can be present for his client's testimony during a grand jury proceeding. 42 Pa.C.S. 4549(c)(1); Pa.R.Crim.P. 231(A) ("The attorney for the Commonwealth, the alternate grand jurors, the witness under examination, and a stenographer may be present while the investigating grand jury is in session. Counsel for the witness under examination may be present as provided by law."). Schultz submits that the Grand Jury Act "requires that the attorney give the individual, and not the entity that once employed him, 'independent professional judgment' and all that comes with it, including loyalty and confidentiality." Appellant's brief at 27 (citing 42 Pa.C.S. § 4549(c)(4)). He argues that the trial court's ruling that Ms. Baldwin only represented Schultz as an agent of her real client, Penn State, creates a second-class type of partial representation that is not recognized under the common law or the Pennsylvania Rules of Professional Conduct. Schultz avers that "[i]f Ms. Baldwin was not acting as counsel for Mr. Schultz in his personal capacity, her presence during the grand jury proceeding was in violation of the rules governing grand jury secrecy, prejudicing Mr. Schultz." Appellant's brief at 29.

The trial court ruled that, because Ms. Baldwin represented Schultz as an agent of Penn State, he was not denied counsel at the grand jury

proceeding. Schultz counters that this agency-counsel relationship did not provide sufficient protection of the Grand Jury Act's right to counsel and of his right against self-incrimination inherently protected in the Act's requirement for counsel. *See* Pa.Const. Art. I, § 9 ("in prosecutions by indictment or information, . . . . he cannot be compelled to give evidence against himself"). Schultz argues that the trial court's concept of agency representation herein "relieves the attorney of the duty to exercise loyalty and independent judgment, to provide competent and diligent representation to each client, to obtain each client's informed consent, preferably in writing, before proceeding with the representation, and to maintain the client's communications as confidential." Appellant's brief at 41. He adds that a person subpoenaed to testify in front of a grand jury is "not always aware of 'reasonable cause to apprehend danger' and may not know whether he should 'exercise his right against self-incrimination.'" *Id*. at 42 (quoting *McCloskey*, *supra* at 777). In this respect, Schultz highlights that "[n]ot only are the stakes in giving testimonial evidence before a grand jury high, they are also entirely personal." Appellant's brief at 42.

Schultz points out that witnesses face potential personal criminal liability and that a corporation, unlike an individual, has no right against self-incrimination. Indeed, while the corporate defendant can be criminally fined, only the individual agents of the corporation face the onerous criminal

punishment of incarceration.[20] He continues that the Grand Jury Act is intended to protect a witness's right against self-incrimination by affording that person the right to personal counsel for purposes of consultation during questioning. He avers that the colloquy provided by the grand jury supervising judge emphasizes the personal right to an attorney. In short, he maintains, "[e]mployees, like Mr. Schultz, who testify in response to a grand jury subpoena, necessarily do so in their individual capacities, and they enjoy a personal privilege against self-incrimination that only they can choose to waive." *Id*. at 46.

While Schultz acknowledges that an attorney may limit her representation of a client, he notes that the client must give informed consent. *See* Pa.R.Prof.Conduct 1.2(c). The rules of professional conduct define such consent as "consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Pa.R.Prof.Conduct 1.0(e). Schultz posits that Ms. Baldwin did not discuss her limited representation with him, nor did she

---

[20] We do note that the Commonwealth has failed to cite a single case where a witness testified before a grand jury in an organizational or representative capacity and the testimony offered was used to prosecute the individual in a personal capacity. In contrast, the United States Supreme Court has held that a witness cannot be made to testify before a grand jury as a representative of an organization because any testimony would be personal. *See Curcio v. United States*, 354 U.S. 118, 123-124 (1957).

receive informed consent from him. Lastly, Schultz highlights that Ms. Baldwin did not seek a waiver from him regarding the attorney-client privilege and Penn State expressly informed Judge Feudale and the OAG that it did not waive its privilege as to communications between Ms. Baldwin and Schultz. Thus, Schultz contends that his communications with Ms. Baldwin in advance of his grand jury testimony remained confidential and inadmissible and that Ms. Baldwin breached her obligation to him by testifying in the later grand jury proceeding.

Schultz also distinguishes the non-precedential decisions relied on by the trial court: *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1988), *Maleski by Chronister v. Corporate Life Ins. Co.*, 641 A.2d 1 (Pa.Cmwlth 1994), and *United States v. Norris*, 722 F.Supp. 2d 632 (E.D. Pa. 2010). In those cases, the issues did not involve representation by an attorney before an investigating grand jury. Schultz contends that providing subpoenaed testimony in front of a grand jury is not analogous to the aforementioned cases. He submits that a grand jury witness, even a corporate employee, is subject to individual criminal liability for testimony given before a grand jury and, in Pennsylvania, unlike the federal system, the witness has a statutory right to counsel to advise and protect the personal interests of the witness. Schultz sets forth that "Ms. Baldwin made no statement that defined or limited her role as counsel for Mr. Schultz, creating the impression that she was the

lawyer that Judge Feudale's colloquy and the statute envisioned, not merely corporate counsel with a limited if any obligation to the witness." Appellant's brief at 34.

In Schultz's view, the proper standard for determining whether the attorney-client privilege exists is based on the client's reasonable belief. In this regard, he maintains that he and Ms. Baldwin met to discuss his grand jury appearance, and Ms. Baldwin agreed to appear with him, but she neglected to properly or adequately explain the distinction between representing him as an individual or as an agent of Penn State. Further, Judge Feudale's colloquy focused on Schultz's right to counsel in the context of personal representation and Ms. Baldwin did not place on the record any limitations as to her representation.

Schultz asserts, with respect to the attorney-client privilege implications, that "Ms. Baldwin's personal opinion that she did not represent Mr. Schultz personally does not matter." *Id*. at 37. Rather, he argues that the attorney-client privilege exists where:

> 1) The asserted holder of the privilege is or sought to become a client.
>
> 2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.
>
> 3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

> 4) The privilege has been claimed and is not waived by the client.

**Commonwealth v. Mrozek**, 657 A.2d 997, 998 (Pa.Super. 1995).

Applying these principles, Schultz points out that Ms. Baldwin identified herself as counsel for Schultz before his grand jury testimony and did not limit or restrict her scope of representation at that time. Ms. Baldwin is an attorney, and she and Schultz discussed one-on-one his subpoena and required appearance before the grand jury. Those discussions were for purposes of legal assistance and Schultz has invoked his privilege.

The Commonwealth responds to this aspect of Appellant's argument by arguing that the trial court correctly relied on **Bevill**. In its view, **Bevill** addresses the scope of corporate counsel's representation and whether that representation extends to an individual employed by the corporation. The Commonwealth concedes that the **Mrozek** test determines if an attorney-client relationship exists. Hence, it acknowledges that Schultz and Ms. Baldwin had an attorney-client relationship, but maintains that Ms. Baldwin represented him in an agency capacity only. Since, according to the Commonwealth, the question before the trial court was the *scope* of Ms. Baldwin's representation, it submits that the trial court appropriately relied on **Bevill** and **Maleski**.

The Commonwealth also rejoins that Schultz was not represented in his individual capacity by Ms. Baldwin and, therefore, no privilege exists. It

further disputes his position that Ms. Baldwin could not be present at his grand jury testimony unless she represented him personally. The Commonwealth continues that an attorney can represent a person appearing before a grand jury as a representative of an organization employing that individual. It cites Pa.R.Prof.Conduct. 1.13, in support. That rule provides in pertinent part, "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Pa.R.Prof.Conduct. 1.13(a). In addition, Rule 1.13(e), sets forth, "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7." Rule 1.7 reads in relevant part:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

Pa.R.Prof. Conduct 1.7.

In the Commonwealth's view, however, Ms. Baldwin did not represent conflicting interests nor did she represent multiple clients. Instead, it posits that she represented Penn State solely and, based on the information provided by Schultz, Curley, and Spanier, the interests of Penn State and those individuals did not diverge. It therefore neglects to discuss the requirements of informed consent.

## Part VII. Analysis

Under the particular facts herein, we find the trial court's reliance on **Bevill**, **Maleski**, and **Norris** to be erroneous. In **Bevill**, there were two related proceedings: a Chapter 11 bankruptcy reorganization of a corporation and the liquidation of a related corporation. Bevill, Bresler & Schulman Asset Management Corporation ("AMC") was involved in the bankruptcy proceeding and Bevill, Bresler & Schulman, Inc., ("BBS") in the liquidation matter. Robert Bevill and John Rooney were principals in both corporations.

There, the president of AMC, Gilbert Schulman, had consulted with the law firm of Hellring, Lindeman, Goldstein, Siegal, & Greenberg, ("Law Firm") between March 25, 1985 and April 7, 1985. Bevill and Rooney were present

for some of those meetings. Schulman, in the course of meeting with the Law Firm, explained that he was consulting them for the purpose of potentially representing him and Bevill personally or the two corporations. Ultimately, on March 31, 1985, BBS retained the Law Firm to represent it.

During depositions, the trustee for AMC attempted to question Schulman regarding his communications with the Law Firm, setting forth that AMC waived its attorney-client privilege. Schulman's counsel directed Schulman not to answer and counsel for Bevill and Rooney also instructed Schulman not to respond because the attorney-client privilege applied as part of the joint defense doctrine. Thereafter, trustees for AMC and BBS and the SEC, which was investigating the companies for fraud, filed motions directing Schulman, Bevill, and Rooney to respond to the deposition questions.

The district court conducted a hearing and directed Schulman, Rooney, Bevill, the Law Firm, and several other principals to answer written interrogatories regarding the scope of the Law Firm's representation. Rooney and Bevill asserted their Fifth Amendment rights. The district court concluded that information sought about meetings before March 31st with Hellring was privileged. However, it determined that other communications after that date were not. The district court ordered Schulman and Hellring to answer the depositions from the trustees of both corporations and rejected

Rooney and Bevill's assertion of a joint defense privilege. Rooney and Bevill contended that the order violated their individual attorney-client privilege.

The Third Circuit Court of Appeals framed the dispute as "center[ing] on whether the individuals' assertion of an attorney-client privilege can prevent the disclosure of corporate communications with corporate counsel when the corporation's privilege has been waived." *Bevill*, *supra* at 124.[21]

The *Bevill* Court held that Bevill and Rooney could not "assert their personal privilege over the corporation's waiver **with regard to corporate matters**." *Id*. at 125 (emphasis added). In doing so, the *Bevill* Court noted that the district court had examined the claim of attorney-client privilege under the following test:

> First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And, fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

---

[21] Here, of course, Penn State declined to waive its own privilege as to communications between Schultz and Ms. Baldwin. Further, Schultz was consulting Ms. Baldwin about appearing before an investigative grand jury regarding a criminal investigation into Jerry Sandusky.

*Bevill*, *supra* at 125.[22] The Third Circuit ruled that "[t]he test adopted by the district court does not invade the personal privilege of the officers because they do not have an attorney-client privilege with regard to communications made in their role as corporate officials." *Id*. It, however, noted that the district court did not preclude Rooney and Bevell from asserting a personal privilege as to communications not related to their role as officers of the corporation. *See also* footnote 20.

The trial court herein imprecisely stated that Pennsylvania adopted the five-part test outlined in *Bevill*, citing *Maleski*, *supra*. However, *Maleski* was a non-binding single judge decision by the Commonwealth Court. It, therefore, lacks precedential value. *See* 210 Pa.Code § 69.414(b) ("a single

---

[22] Both the Tenth Circuit Court of Appeals and the First Circuit Court of Appeals have explained the fifth aspect of *Bevill* as follows,

> The fifth prong of *In Matter of Bevill,* properly interpreted, only precludes an officer from asserting an individual attorney client privilege when the communication concerns the *corporation's* rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the *individual officer's* personal rights and liabilities, then the fifth prong of *In Matter of Bevill* can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

*In re Grand Jury Subpoena*, 274 F.3d 563, 572 (1st Cir. 2001) (citing *Grand Jury Proceedings v. United States,* 156 F.3d 1038, 1041 (10th Cir. 1998)).

judge opinion of [the Commonwealth] court, even if reported, shall be cited only for its persuasive value and not as binding precedent."). Further, this Court is not bound by decisions by our sister court. *See Estate of Brown*, 30 A.3d 1200, 1205 n.2 (Pa.Super. 2011). Thus, *Maleski* can only serve as persuasive authority and is not governing Pennsylvania law. *Id*.

While citing *Maleski*, the trial court did not discuss that case and instead focused on *Norris*, *supra*.[23]  In *Norris*, a federal grand jury investigating price fixing served a subpoena on Morganite. Morganite was a United States subsidiary corporation of Morgan Crucible Company ("Morgan"), a British corporation. Morgan hired a law firm to respond to the subpoena and conduct an internal corporate investigation. Norris was a corporate officer with Morgan. As part of the law firm's investigation, and in

_____

[23] *Maleski* involved a corporate liquidation matter of a life insurance company, Corporate Life. The Commonwealth Court ordered that Corporate Life be dissolved and liquidated. It also instructed Corporate Life to turn over all of its files to a special counsel for the Insurance Commissioner. Former counsel for Corporate Life, Berry & Martin, and two corporate officers contended that certain materials were privileged and protected as work product.

The judge in *Maleski* acknowledged that corporate officers may hold a privilege as to communications with corporate counsel if they are seeking individual representation. It then cited the five-part test discussed in *Bevill*, *supra*. The court directed further proceedings to determine if various communications were privileged. It did not rule that communications between corporate counsel and officers of that corporation were not subject to the attorney-client privilege.

attempting to supply documents pertaining to the subpoena, Norris met with counsel on at least two occasions and spoke with the attorney several other times. Each meeting was initiated by counsel.

The attorney also appeared with Norris during a Canadian antitrust interview and at an unrelated interview with the Federal Trade Commission. Importantly, the attorney told Norris that he represented Morgan and did not represent Norris in a personal capacity. Critically, counsel explicitly advised Norris to retain independent counsel. Norris was not called as a witness to testify before the grand jury and Morgan's lawyer was not asked by Norris to represent him. Further, the attorney and Norris did not discuss personal legal matters concerning Norris. Morgan, unlike Penn State with regards to communications between Ms. Baldwin and Schultz, also waived its privilege. The **Norris** Court concluded that Norris failed to establish that corporate counsel represented him in an individual capacity during the internal investigation by Morgan.

As noted, the Commonwealth contends that **Bevill** controls, while Schultz maintains that **Mrozak** is the proper governing precedent. We agree with Schultz that the **Bevill** test is inapt. As noted above, **Bevill** and **Norris** did not involve a corporate attorney consulting with, in this case, a former employee, for purposes of that person's preparation for testimony before a criminal investigating grand jury and the attorney appearing and being present during that grand jury testimony. **Bevill** and **Norris** involved

federal litigation where the individual had no right to the presence of an attorney during grand jury testimony. Thus, in this case there are additional concerns regarding whether counsel adequately alerted Schultz to the distinction between his right to statutory individual representation and representing him solely as an agent of Penn State.

The intent of our legislature in affording counsel during a grand jury proceeding was to protect the testifying individual's rights, most vitally the possibility of incriminating himself or herself. *See McCloskey*, *supra* at 144 ("Determining what is an incriminating statement is not always clear to a layman."). Hence, the right envisioned by the legislature is a personal right. *See Commonwealth v. Columbia Investment Corp.*, 325 A.2d 289 (Pa. 1974) (Nix, J., dissenting) (arguing in favor of counsel's presence during grand jury questioning in a pre-statutory right to grand jury counsel case); *see also McCloskey*, *supra* 780-781 (Eagen, J., concurring and dissenting) (arguing in favor of right to counsel during grand jury testimony). Pointedly, the presence of the attorney in the grand jury room would be rendered nugatory if that lawyer is not present for the purpose of protecting the witness against incriminating himself.

In other contexts involving the right to counsel, Pennsylvania courts have insisted that any waiver of counsel be made knowingly, intelligently, and voluntarily. *See Commonwealth v. Grazier*, 713 A.2d 81, 82 (Pa. 1998) ("When a waiver of the right to counsel is sought at the post-

conviction and appellate stages, an on-the-record determination should be made that the waiver is a knowing, intelligent, and voluntary one."); **see also** Pa.R.Crim.P. 121.

Applying **Mrozek**, it is evident that an attorney-client relationship existed. **Mrozek** espouses a four-part inquiry to determine if an attorney-client relationship exists. First, the person asserting the privilege must show that he is or sought to become a client. Instantly, Schultz met with Ms. Baldwin to discuss the subpoena served on him to testify before a criminal grand jury investigating Jerry Sandusky. Schultz was no longer employed by Penn State when he discussed his appearance before the grand jury with Ms. Baldwin. The subpoena, in contrast to the subpoena *duces tecum*, was not for the University.[24] It is beyond cavil that this meeting was for the purpose of securing legal advice. The trial court itself found that Schultz approached Ms. Baldwin for legal advice related to appearing before the grand jury investigation into Jerry Sandusky.

The second prong of the **Mrozek** test is also unequivocally satisfied, *i.e.*, the person to whom the communication was made is a lawyer. There is no dispute that Ms. Baldwin was a licensed attorney at the time she

---

[24] Had the subpoena been served on the University, Ms. Baldwin would not have needed to ask permission from Schultz to accept service of the subpoena. Thus, the trial court's reliance on the OAG serving Schultz via Ms. Baldwin rather than at his home is a *non-sequitur*.

discussed Schultz's legal options and requirements relative to the subpoena. The third aspect of the *Mrozek* test examines whether the communication between the attorney and putative client/client relates to facts told the attorney or client, without the presence of strangers, in order to secure legal opinions or services in a legal matter, and not for the purpose of committing a crime or tort. The issues communicated and addressed were not general business matters relative to the operation of the University, but pertained to the criminal investigation into Jerry Sandusky. Indeed, unlike the cases relied on by the trial court, this case did not involve discussions between corporate counsel and officers of the corporation for purposes of operating and running that business or an internal investigation into its business practices.

Ms. Baldwin also communicated with Schultz and expressed her belief that no conflict prevented her from representing Schultz and Curley. Thus, ostensibly, Ms. Baldwin was aware of the potential for a conflict of interest between Schultz and other individuals. The communication between Schultz and Ms. Baldwin occurred one-on-one and she did not reveal those communications to the Board of Trustees of Penn State, outside of possibly Spanier.[25] The communications concerned the rights and responsibilities of

_____

[25] Ms. Baldwin expressly testified about what she disclosed to the Board of Trustees as follows,

*(Footnote Continued Next Page)*

Schultz relative to appearing before a criminal investigating grand jury and not Penn State's corporate rights. Finally, Schultz has claimed his privilege and Penn State has expressly refused to waive any privilege relative to communications between Ms. Baldwin and him. Thus, the last prong of the *Mrozek* test has been met.

Moreover, Ms. Baldwin did not adequately explain to Schultz that her representation of him was solely as an agent of Penn State and that she did not represent his individual interests. Although Schultz was certainly aware that Ms. Baldwin was general counsel for Penn State, it is unreasonable to conclude that this awareness by a lay person *ipso facto* results in Schultz knowing that she represented him solely in an agency capacity. As the *Bevill* Court itself recognized, certain communications between corporate counsel and an employee can be personally privileged.

While Ms. Baldwin could have limited the scope of her representation during Schultz's grand jury testimony or prior thereto, there is no support in the record that such a limited representation was adequately explained to

*(Footnote Continued)* ————————

> I gave the presentation, talking about the whole grand jury process, talking about what had appeared in the newspaper, talking about, you know, what we knew, not saying anything about the testimony of Curley, Schultz, or Spanier because that was—they could disclose—I can't disclose their testimony and so I told them about all of that.

N.T., 10/26/12, at 35.

Schultz or that he provided informed consent to such a representation. Additionally, the judge of the supervising grand jury did not colloquy Schultz regarding any potential issue relative to Ms. Baldwin representing Schultz in a non-individual capacity.[26]

Ms. Baldwin's after-the-fact justifications for her own testimony were not expressed on the record prior to Schultz's testimony, nor is there sufficient evidence that she properly advised Schultz of the limits of her representation. Simply stating that she could reveal communications to the Penn State Board of Trustees and was general counsel to the University was decidedly inadequate. Pointedly, Ms. Baldwin's statement that communications could be shared with the Board of Trustees is consistent with the joint attorney-client privilege concept. As Schultz notes in his reply brief, "The fact that Ms. Baldwin shared confidential information among co-clients, and correctly advised her co-clients that she would do so, does not

_____

[26] Judge Feudale, in an opinion addressing motions filed by Spanier, Curley, and Schultz, seeking quashal of the grand jury presentments, opined in *dicta*, "In hindsight, perhaps I erred in not asking follow up question about the role of corporate counsel Baldwin. I regret and perhaps committed error in not asking any follow up questions but while I am unaware of what the response would have been, I fail to discern how such would persuade me at this stage why [the] presentments should be dismissed." Judge Feudale Opinion, 4/9/13, at 11. Ultimately, Judge Feudale ruled that he lacked jurisdiction to consider the motions in question. We agree with Judge Feudale, to the limited extent that he erred in neglecting to properly probe into the scope of Ms. Baldwin's representation to ensure that Schultz, Curley, and Spanier understood whether Ms. Baldwin was acting to protect their interests or that of the University. **See also** 42 Pa.C.S. § 4549(c)(4).

destroy the privilege; rather, it is a routine part of joint client representation." Appellant's reply brief at 11-12.

### Part VIII. Conclusion

As our Rules of Professional Conduct illustrate, communications between a putative client and corporate counsel are generally privileged prior to counsel informing the individual of the distinction between representing the individual as an agent of the corporation and representing the person in his or her personal capacity. *See* Pa.R.Prof.Conduct 1.2(c) (lawyer may limit scope of representation provided the client gives informed consent); Pa.R.Prof.Conduct 1.0(e) (defining "informed consent"); *see also* Pa.R.Prof.Conduct 1.6(a) ("A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out representation and except as stated in paragraphs (b) and (c)."); *see also* Pa.R.Prof.Conduct 1.18(b) ("Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal information which may be significantly harmful to that person").

When corporate counsel clarifies the potential inherent conflict of interest in representing the corporation and an individual and explains that the attorney may divulge the communications between that person and the attorney because they do not represent the individual, the individual may then make a knowing, intelligent, and voluntary decision whether to

continue communicating with corporate counsel. This is all the more essential where the purpose of the individual seeking advice relates to an appearance and testimony before a criminal investigating grand jury.

Absent a privilege existing for preliminary communications, the putative client cannot have full and frank discussions with the attorney in order to determine whether it would be appropriate for that lawyer to represent him or her in an individual capacity. **See Chmiel**, **supra** at 422-423 ("The purpose of the privilege is not to further the fact-finding process, but to foster a confidence between attorney and client that will lead to a trusting and open dialogue."); **Upjohn**, **supra** at 389 ("Its purpose is to encourage full and frank communication between attorneys and their clients.").

Furthermore, the attorney might be unable to make a determination as to whether he or she could represent that individual personally if the putative client believes full disclosure will not be kept confidential. **See In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 216-217 (internal citations and parenthetical omitted) ("The attorney-client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client. The central principle is that a client may be reluctant to disclose to his lawyer all facts necessary to obtain informed legal advice, if the communication may later be exposed to public scrutiny.").

Insofar as Ms. Baldwin has repeatedly maintained that she did not represent Schultz's individual interests, absent an adequate colloquy or other evidence reflecting acquiescence to such limited representation for purposes of her presence during his grand jury testimony, we find that Schultz's statutory right to counsel during his grand jury testimony was infringed. Indeed, we agree that Ms. Baldwin's acknowledged agency representation of Schultz during his grand jury testimony, without proper and adequate explanation and informed consent to allow limited representation, left Schultz constructively without personal counsel for purposes of his grand jury appearance. Where an attorney purports to offer only limited representation before and at a grand jury proceeding, we find that a putative client must be made expressly aware of that fact. **See** Pa.R.Prof.Conduct 1.2 (attorney may limit scope of representation provided client gives informed consent); Pa.R.Prof.Conduct 1.0 (defining informed consent); **see also** Pa.R.Prof.Conduct 1.18(b) (communications between prospective client and attorney are privileged). We add that Ms. Baldwin did not provide anything akin to **Upjohn** warnings.

As Schultz consulted with Ms. Baldwin for purposes of preparing for his grand jury testimony relative to a criminal investigation into Jerry Sandusky, and reasonably believed she represented him, and Ms. Baldwin neglected to adequately explain the distinction between personal representation and agency representation, and give appropriate warnings to Schultz, we

conclude that all the communications between Schultz and Ms. Baldwin were protected by the attorney-client privilege. Consequently, Ms. Baldwin breached that privilege by testifying before the grand jury with respect to such communications.

Having reached these determinations, we must now address the proper remedy. Schultz seeks quashal of the perjury, obstruction of justice, and related conspiracy charges, as well as preclusion of Ms. Baldwin from testifying in any other proceedings relative to his privileged communications with her. With respect to the latter position, it is beyond cavil that an attorney cannot reveal privileged communications between herself and her client. Ms. Baldwin was and is incompetent to testify against Schultz. Accordingly, we preclude Ms. Baldwin from testifying in future proceedings regarding privileged communications between her and Schultz, absent a waiver by Schultz.

In regards to Schultz's position that the challenged charges be quashed, we find **McCloskey**, **supra**, enlightening. In **McCloskey**, an evenly divided Superior Court had affirmed a decision to quash indictments and suppress evidence against a number of defendants. The Commonwealth appealed to our state Supreme Court. Central to this case, the court therein looked to "whether, or to what degree, a subpoenaed witness and potential defendant before an investigating grand jury is entitled to the assistance of counsel to aid him in asserting his right against self-incrimination[.]"

*McCloskey*, *supra* at 766.  At that time, counsel was not permitted to be present inside the grand jury room while the witness testified.

The *McCloskey* Court declined to hold that a witness was constitutionally entitled to counsel being present inside the hearing room. Nonetheless, *McCloskey* held that a witness must be instructed that he or she may refuse to answer a question and come before the court with counsel to obtain a ruling regarding issues of self-incrimination.  It found that a number of the witnesses therein were not properly advised about their right against self-incrimination.  The Court noted that the recommendations in the grand jury presentment proposing that the individuals be indicted "were clearly based in part on their incriminating testimony before the investigating grand jury."  *Id*. at 779.  It then quashed the indictments because the presentment and indictments were based in part on "constitutionally impermissible testimony[.]" *Id*..

This Court, in a plurality decision, has also previously applied *McCloskey*. *Commonwealth v. Cohen*, 289 A.2d 96 (Pa.Super. 1972) (plurality).  In *Cohen*, the defendant was indicted based on an investigating grand jury recommendation.  He sought to quash the indictments and suppress his statements to the investigating grand jury.  Cohen alleged that he was denied the right to the advice of counsel and that the supervising judge failed to adequately apprise him of his right against self-incrimination. The trial court denied those motions, but certified its order for purposes of

effectuating an interlocutory appeal. The **Cohen** plurality determined that the court failed to adequately inform the defendant that "should a problem arise while he is being interrogated or should he be doubtful as to whether he can properly refuse to answer a particular question, he can come before the Court accompanied by counsel and obtain a ruling as to whether he should answer the question." **Id**. at 98. The **Cohen** Court ruled that the defendant was deprived of his constitutional rights and that the grand jury indictments relied on Cohen's testimony. Accordingly, it quashed.

In the present case, we acknowledge that Schultz was advised regarding his right against self-incrimination before his own grand jury testimony. However, he was not aware that Ms. Baldwin was not appearing with him in order to protect his interests and therefore unable to provide advise concerning whether he should answer potentially incriminating questions or invoke his right against self-incrimination. Since Schultz was constructively without counsel during his grand jury testimony, and he did not provide informed consent as to limited representation, we agree that his right against self-incrimination was not protected by Ms. Baldwin's agency representation, and the appropriate remedy is to quash the perjury charge arising from the first grand jury presentment.

With respect to the criminal counts arising from the second grand jury presentment, which followed Ms. Baldwin's testimony, we find instructive **State v. Wong**, 97 Haw. 512 (2002). In **Wong**, the Hawaii Attorney

General's Office called a former tax attorney of one of the individuals ultimately charged in the case to testify before a grand jury.[27] The state did not seek a court ruling regarding the scope of the attorney's testimony against his former client. The attorney neglected to notify his client that he was going to testify and did not receive a waiver of the attorney-client privilege from his client. The attorney invoked the crime-fraud exception to the attorney-client privilege during his own testimony to explain his disclosures. Relying in part on the Hawaii Rule of Evidence 104, which is substantially equivalent to the same numbered Pennsylvania Rule of Evidence,[28] the Hawaii Supreme Court noted that preliminary questions

_____

[27] The Hawaii prosecutors also attempted to procure testimony from additional lawyers; however, they raised privilege issues, and there was a court ruling on the extent to which they could testify. *See State v. Wong*, 97 Haw. 512, 515 n.3 (2002).

[28] At the time of Ms. Baldwin's testimony, Pennsylvania Rule of Evidence 104 read,

> **(a) Questions of admissibility generally.** Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

*See* former Pa.R.E. 104(a). The rule was subsequently amended after Ms. Baldwin testified but reflects no substantive change.

regarding the existence of a privilege are to be decided by the court. The

Court continued,

> when a prosecutor seeks arguably privileged testimony, the prosecutor must either (1) give notice to the person who might claim the privilege and the person's counsel, so that the person or the person's attorney can seek judicial review of any claim or privilege or waive the privilege, or (2) give notice to the person's counsel and, if the person's counsel does not raise the privilege and seek judicial review, the prosecutor must seek the court's ruling on the privilege issue. In the latter instance, the prosecutor should proceed with the understanding that if the person who might claim the privilege has not been given notice and an opportunity to be heard on the issue of privilege,  a court's allowance of testimony may be overturned after the holder of the privilege can be heard by the court.

*Wong, supra* at 521.  The *Wong* Court highlighted that the state elicited

the attorney's testimony without distinguishing between matters that were

privileged and determined that allowing the testimony was in error.  In

quashing the indictments therein, it reasoned,

> If the illegal or improper testimony clearly appears to have improperly influenced the grand jurors despite the presence of sufficient evidence amounting to probable cause to indict the defendant, the defendant would be entitled to a dismissal. Where a defendant's substantial constitutional right to a fair and impartial grand jury proceeding is prejudiced, a quashing of the indictment emanating therefrom is an appropriate remedy.

*Id*. at 526.

Instantly, despite Schultz invoking his privilege, despite the Rules of

Professional Conduct requiring a hearing on the privilege issue prior to Ms.

Baldwin's testimony, *see* Pa.R.Prof.Conduct 3.10, despite the Rules of

Evidence mandating that the court determine privilege questions concerning

a witness's testimony before he or she testifies, *see* Pa.R.E. 104, and despite Penn State's general counsel, Mr. Mustakoff, acknowledging the issue, and Deputy Attorney General Fina paying lip service to the privilege concerns, Judge Feudale failed to have a hearing before Ms. Baldwin testified.   We acknowledge that Attorney Fina misled Judge Feudale by claiming that the Commonwealth would not inquire into matters concerning Ms. Baldwin's communications with Schultz, Curley, and Spainer.   In this regard, we highlight that:

> [a prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; . . . As such, he is in a peculiar and very definite sense the servant of the law, . . . He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

Attorney Fina stated that the Commonwealth assumed the risk of proceeding without a clear determination regarding the privilege concerns at play, which is precisely the risk that has now borne fruit in the form of a challenge to the charges flowing in part from such foul blows.  Since the obstruction of justice and related conspiracy charges in this matter relied extensively on a presentment from an investigating grand jury privy to

impermissible privileged communications, we quash the counts of obstruction of justice and the related conspiracy charge.

The charges of perjury, obstruction of justice, and conspiracy are hereby quashed. Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/22/2016