J-A19037-23

2023 PA Super 263

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                               :    PENNSYLVANIA
                                               :

            v.    :

                                                 :

AHMAD NASIR    :

                                             :
                      Appellant    :    No. 925 EDA 2022

Appeal from the Judgment of Sentence Entered March 8, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006797-2019

BEFORE:   BOWES, J., STABILE, J., and PELLEGRINI, J.[*]

OPINION BY BOWES, J.:    **FILED DECEMBER 12, 2023**

Ahmad Nasir appeals from his judgment of sentence of life imprisonment without the possibility of parole imposed upon his convictions of first-degree murder, conspiracy, possession of an instrument of crime ("PIC"), and a violation of the Uniform Firearms Act ("VUFA").  We affirm.

Jimmie Bryant was murdered in an alley in Philadelphia on the evening of January 28, 2019, shot fifteen times by a man who fled in a waiting Nissan Maxima with heavily tinted windows.  Notably, the brake lights of the car were illuminated before the shooter entered through the front passenger door.  The police recovered fired casings from the scene and a holster discarded on the street during the Nissan's flight.  The Nissan ultimately was abandoned on a nearby street.  One police officer caught up to the vehicle in time to witness

_____

[*] Retired Senior Judge assigned to the Superior Court.

the passenger exit but was unable to give chase until backup arrived and it could be determined that the vehicle had no remaining occupants. By that time, neither the passenger nor the driver was able to be located. The police ran the license plate and determined that the vehicle was registered to an address at which Appellant's paramour, Shin Abdussamad, resided.

The subsequent execution of a search warrant on the Nissan produced, *inter alia*, a nine-millimeter Glock semi-automatic handgun containing an empty fifteen-cartridge magazine, a loose ammunition magazine, two cell phones and chargers, gloves, and an opened bottle of Mountain Dew. Fingerprints and DNA evidence were taken from the items where available, as well as from the vehicle itself. Police also recovered paperwork from Delia's Gun Shop, receipts from Spring Garden Wash & Lube, and vehicle registration and insurance cards in the name of Daniel Stephon Brown.[1] Police obtained video from the gun shop and the car wash from January 22, 2019, the date on the receipts. Both of these videos depicted Appellant with a man named Stanley Purcell. Further, Appellant's fingerprints were identified among those taken from the Nissan involved in the shooting.

Homicide detectives informed Agent Edward Lichtenhahn of the Gun Violence Task Force of the attempted gun purchase at Delia's Gun Shop. His investigation revealed that the paperwork and license submitted for the

---

[1] While the registration address was that of Ms. Abdussamad, the police determined that no person named Daniel Stephon Brown lived there.

purchase was in the name of Daniel Stephon Brown. The transaction had been denied because a background check showed that Mr. Brown had been involuntarily committed while he had served in the United States Navy.

Agent Lichtenhahn contacted Ian Johnston, who had served as Appellant's probation officer since December 2018, to review the video footage. He identified Appellant, who was not permitted to carry a firearm. While Appellant had reported as scheduled to Mr. Johnston without any violations for over a year, Mr. Johnson was unable to contact or locate Appellant in the weeks following the shooting.

Both Agent Lichtenhahn and Mr. Johnston obtained warrants for Appellant's arrest. Appellant was eventually apprehended in Virgina in May of 2019, and charged with violating his probation and VUFA. Following the issuance of an arrest warrant and detainer, Appellant waived extradition and was returned to Pennsylvania. A buccal swab was then taken from Appellant's cheek pursuant to a warrant.

Ultimately, the DNA sample obtained from Appellant was matched with that found on the Glock, magazine, cell phones, Mountain Dew bottle, gloves, and various areas of the Nissan, and ballistics testing indicated that the casings recovered from the scene of Bryant's murder were fired from the Glock

in question.[2]  Consequently, Appellant was charged with the remainder of the offenses enumerated above and a warrant for his arrest was issued.

During jury selection for his trial, Appellant raised several challenges pursuant to **Batson v. Kentucky**, 476 U.S. 79 (1986) (establishing the procedure for a defendant to allege purposeful discrimination in the selection of a jury through the prosecutor's use of peremptory challenges).  Specifically, Appellant alleged that the Commonwealth improperly struck two black jurors on account of their race.  However, the trial court accepted the Commonwealth's proffered reasons for dismissing those jurors as legitimate and race-neutral and denied Appellant's challenges.

At trial, the Commonwealth offered numerous witnesses to testify to the facts outlined above.  Additionally, the Commonwealth called Detective Thorsten Lucke, an expert in video recovery and analysis.  The evening before testifying, Detective Lucke had created a video that compiled footage from Delia's Gun Shop, the Spring Garden Wash & Lube, and the area of the shooting.  Within the compilation, Detective Lucke superimposed a still image of Appellant taken from the gun shop onto footage of the Nissan's passenger

_____

[2] One of the phones had DNA from at least two people.  That phone was registered to Ms. Abdussamad.  Other unidentified DNA and fingerprints were recovered elsewhere, of particular note on the driver's side of the Nissan.  Lab tests were inconclusive as to whether this evidence related to Mr. Purcell, who arrived at a local hospital shortly after the shooting with a gunshot wound to his hand and bullet fragments on his clothing, but declined to indicate where or how he was shot.

at the scene of the murder for the purpose of facilitating comparison of Appellant's appearance at the time in question with the appearance of the purported shooter. Appellant, who had not previously seen the compilation video, objected. The trial court sustained the objection, ruling that the inserted image be removed from the rest of the video and instructing the jury that it was within their sole province to determine the identity of the Nissan's passenger. After the jury nonetheless saw the inserted image again, Appellant unsuccessfully moved for a mistrial on multiple occasions.[3]

In the end, the jury convicted Appellant of the crimes listed at the outset of this writing. The same day, the court sentenced him to the mandatory term of life imprisonment, with concurrent sentences of ten to twenty years for conspiracy, three to six years for VUFA, and two to four years for PIC. Appellant filed a timely post-sentence motion which the trial court promptly denied without a hearing. This timely appeal followed, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following questions, which we have re-ordered for ease of discussion:

> 1. Did the court err, abuse its discretion and violate due process of law when it denied the defense motion to dismiss the conspiracy count at the close of the evidence as the

---

[3] During deliberations, the jury asked to review the video footage. The trial court accommodated the request, permitting the jury to watch unaltered footage of the gun shop, of the person exiting the Nissan, and of the individual running back to and entering the Nissan.

evidence was insufficient to permit it to go to the jury or to sustain a guilty verdict?

2. When there was no evidence upon which to base such an instruction, did the court err and abuse its discretion when it instructed the jury that it could find Appellant guilty of first- or third-degree murder, if he or a co-conspirator killed the victim and Appellant had a specific intent to kill and/or malice[?]

3. Did the court err, abuse its discretion and violate Appellant's right to due process of law secured by the Fourteenth Amendment to the United States Constitution and the Pennsylvania Constitution, and Pa.R.Crim.P. 573, when it denied Appellant's mistrial motion following the prosecutor's display during the testimony of Detective Thorsten Lucke of a video in which [Detective] Lucke inserted Appellant's photo . . . without having provided said altered video to the defense prior to displaying it to the jury?

4. Did the trial prosecutor violate Appellant's right to equal protection of the law secured by the Fourteenth Amendment to the United States Constitution and the Pennsylvania Constitution as articulated in **Batson** . . . when he peremptorily struck African-American venirepersons 15 and 22?

5. Did the court abuse its discretion, err, make unsupported factual findings and misapply steps two and three of the **Batson** three-step process, when it found that the prosecutor offered race neutral reasons for these strikes and found "no pattern?"

Appellant's brief at 2-3.

We first examine Appellant's claims that the Commonwealth's evidence was insufficient to (1) survive his motion to dismiss the conspiracy charge, and (2) support instructing the jury on conspiracy liability. Although stated as separate issues, Appellant essentially presents the same argument for each. *See* Appellant's brief at 34-36. This is apt, because if the evidence was

legally sufficient to defeat a motion to dismiss the conspiracy charge, then it was sufficient to warrant a jury instruction on conspiracy liability. *See Commonwealth v. Chambers*, 980 A.2d 35, 49 (Pa. 2009) ("Instructions on defenses or theories of prosecution are warranted when there is evidence to support such instructions.").

The following legal principles govern our consideration of legal sufficiency:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Goodis*, 299 A.3d 1008, 1014 (Pa.Super. 2023) (cleaned up).

A conviction for criminal conspiracy requires the Commonwealth to prove that the defendant: "(1) entered into an agreement to commit or aid in an unlawful act with another person or persons; (2) with a shared criminal intent; and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Munson*, 261 A.3d 530, 542 (Pa.Super. 2021). We have

observed that "it is difficult to prove an explicit or formal agreement to commit an unlawful act," and, therefore, agreement is often "proved inferentially by circumstantial evidence[.]" **Commonwealth v. Thoeun Tha**, 64 A.3d 704, 710 (Pa.Super. 2013) (cleaned up). In this vein:

> The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. The conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

**Commonwealth v. Watley**, 81 A.3d 108, 116 (Pa.Super. 2013) (cleaned up).

Appellant argues that the circumstantial evidence in this case "was illusory and far too speculative" to establish his participation in a conspiracy to murder Mr. Bryant. Appellant's brief at 34. He contends that it was "too giant a leap" to find a conspiracy from the facts that forensic evidence showed that Stanley Purcell had been in the Nissan at some point in time and had accompanied Appellant when he attempted to purchase a firearm less than a week before the murder. *Id*. at 35. Appellant suggests that the fact that objective evidence demonstrated that the brake lights had been activated on the Nissan when he entered the passenger door after the shooting was insufficient to establish "that there was a second person in the car at the time of the killing," claiming that "a simple Google search" indicates that brake light malfunctions can cause the lights to remain on when the pedal is not

- 8 -

depressed.[4]  *Id*.  Since no one other than Appellant was ever seen entering or exiting the Nissan, Appellant maintains that the existence of a getaway driver was mere speculation.  *Id*. at 36.

We reject Appellant's contention that finding the existence of a conspiracy from the evidence here required guesswork rather than logical inferences.  As the trial court painstakingly set for in its Pa.R.A.P. 1925(a) opinion, the Commonwealth's evidence permitted the jury to reasonably conclude that Appellant planned and executed the murder of Mr. Bryant with at least one other person.  *See* Trial Court Opinion, 8/22/22, at 3-25, 50-55. In short, the circumstances surrounding Appellant's criminal activities, from the attempted illicit purchase of the murder weapon with Mr. Purcell to the use of a driver to get to and flee from the murder, evinced that Appellant and at least one other person had a shared intent to kill Mr. Bryant, agreed to do so, and committed multiple overt acts in furtherance of that agreement. *Accord Commonwealth v. Jordan*, 212 A.3d 91, 98–99 (Pa.Super. 2019) (finding conspiracy sufficiently established by the defendant's association with

---

[4] Appellant does not indicate where this Google search evidence was admitted at trial, and we have been unable to locate it within the certified record.   We admonish counsel that evidence *de hors* the record is wholly inapplicable to our review.  *See*, *e.g.*, *Everett Cash Mut. Ins. Co. v. T.H.E. Ins. Co.*, 804 A.2d 31, 34 (Pa.Super. 2002) ("Under our Rules of Appellate Procedure, those documents which are not part of the 'official record' forwarded to this Court are considered to be non-existent." (cleaned up)); Pa.R.A.P. 1921, *Note* ("An appellate court may consider only the facts which have been duly certified in the record on appeal.").

another person before and after the shooting); *Commonwealth v. Davalos*, 779 A.2d 1190, 1193–94 (Pa.Super. 2001) (holding conspiracy established where one individual drove the shooter to the scene, waited "long enough for the shooter to empty his gun into [a] group of men," and served as the getaway driver). Therefore, Appellant's first two issues merit no relief.

Appellant next asserts that the trial court erred in denying his requests for a mistrial based upon the altered video evidence offered by Detective Lucke. We consider this issue mindful of the following principles:

> The trial court is in the best position to assess the effect of an allegedly prejudicial [piece of evidence] on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014) (cleaned up). The moving party bears the burden of proving prejudice. *See Commonwealth v. Pope*, 14 A.3d 139, 145 (Pa.Super. 2011).

Appellant argues that the trial court should have granted a mistrial based upon the prosecution's use of an altered video at trial without first providing it to Appellant as is required by Pa.R.Crim.P. 573. That Rule mandates that the Commonwealth disclose and permit defense counsel to inspect, *inter alia*, "any tangible objects, including documents, photographs, fingerprints, or other tangible evidence," and "the transcripts and recordings

of any electronic surveillance, and the authority by which the said transcripts and recordings were obtained." Pa.R.Crim.P. 573(B)(1)(f)-(g). The Rule's remedy provision states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Pa.R.Crim.P. 573(F). "A violation of discovery does not automatically entitle appellant to a new trial. Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure." *Commonwealth v. Brown*, 200 A.3d 986, 993 (Pa.Super. 2018) (cleaned up).

Here, Appellant acknowledges that the trial court found a discovery violation but maintains that the court abused its discretion in ruling that a cautionary instruction was sufficient to remedy the situation. He posits that this case "was after all an identification case," with the video "important enough to the jury, that it asked to view it a second time (albeit, without the alteration)" and "to view Appellant without the mask that he had been wearing because of COVID." Appellant's brief at 33. Appellant asserts that he suffered "significant" prejudice in that the altered video "effectively created evidence that had not been previously disclosed that "caused suggestivity beyond repair." *Id*.

- 11 -

The trial court explained its decision as follows:

The record reflects that this court denied Appellant's motion for a mistrial on several occasions, thereby finding that Appellant was not prejudiced by the inclusion of the inserted photograph such that he was deprived of a fair trial. This court agreed that the final version of Detective Lucke's compilation video, with all inserted comparison photographs, should have been disclosed to Appellant's counsel. The failure to disclose was not the result of any intentional act by the Commonwealth. Moreover, all the footage contained in the compilation video, including the source of the disputed inserted photograph, had been previously disclosed during discovery. Furthermore, the source of the inserted photograph, the footage taken from Delia's Gun Shop showing Appellant attempting to purchase a firearm, was shown to the jury without objection during the testimony of Ian Johnston and earlier during the testimony of Detective Lucke. As this footage exceeded five minutes in duration, the jury had therefore viewed the footage extensively before any comparison photographs were inserted.

As the compilation video and inserted photograph were therefore c[ompo]sed of evidence previously disclosed to the defense and presented to the jury, Appellant cannot demonstrate that he was prejudiced by the video. Moreover, any potential prejudice that Appellant might have suffered by the presentation of the compilation video was cured when this court issued both a clarifying instruction and a full curative instruction to the jury. As the law presumes that the jury will follow the instructions of the trial court, the issuance of these instructions eliminated any need to declare a mistrial. There is no suggestion within the record that the jury was unable to appropriately weigh the evidence and render a fair verdict.

Trial Court Opinion, 8/22/22, at 48 (unnecessary capitalization omitted).

We discern no abuse of discretion in the trial court's ruling. Plainly, if the Commonwealth had printed still photographs from the gun shop video and the footage at the scene of the murder, it could have held them side by side and allowed the jury to assess the resemblance between the two. That is in

essence what occurred here, not, as Appellant suggests, the equivalent of an unduly suggestive lineup for an eyewitness identification. Further, the trial court properly instructed the jury that it alone was to decide whether it was Appellant in both instances. As any prejudice here was remedied through the instructions, a mistrial was unwarranted. *Accord Commonwealth v. Chambers*, 599 A.2d 630, 638 (Pa. 1991) ("Since Appellant has not demonstrated how he was prejudiced by the failure to review these notes prior to trial, we find no abuse of discretion or error of law in the trial judge's refusal to grant a mistrial."). Consequently, no relief is due.

Finally, we turn to Appellant's *Batson* issues, beginning with a review of the applicable law. The *Batson* decision recognizes two types of harm flowing from the racially-motivated use of peremptory strikes: (1) the harm caused by "a trial where members of the defendant's own race have been excluded from the jury on account of their race," and (2) "harm to the prospective jurors and the community at large that results when citizens are denied participation in jury service based upon their race." *Commonwealth v. Sanchez*, 36 A.3d 24, 44 (Pa. 2011) (cleaned up). "The successful *Batson* objector is the third[-]party beneficiary of the venire person's equal protection right not to be excluded from a jury on account of his/her race." *Id*.

> To show a *Batson* violation, an appellant must generally demonstrate his particular factual situation satisfies the well-established test laid out by the United States Supreme Court's opinion in that case: First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been

- 13 -

made, the burden shifts to the prosecutor to articulate a race-neutral explanation for his peremptory challenges. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

***Commonwealth v. Simpson***, 66 A.3d 253, 261 (Pa. 2013).

A ***Batson*** claim presents a mixed question of law and fact, and "[t]he ultimate burden of persuasion regarding racial motivation rests with the opponent of the strike." ***Commonwealth v. Murray***, 248 A.3d 557, 567 (Pa.Super. 2021). Specifically, while the first and second prongs of a ***Batson*** claim present legal issues, the trial court's ruling on the persuasiveness of the proffered race-neutral explanation constitutes a factual finding. ***See Commonwealth v. Roney***, 79 A.3d 595, 619 (Pa. 2013). In this regard:

> The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent. This Court must give great deference to the trial court's determination that peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. Such great deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations. Moreover, there will seldom be much evidence on the decisive question of whether the race-neutral explanation for a peremptory challenge should be believed; the best evidence often will be the demeanor of the prosecutor who exercises the challenge.

***Murray***, ***supra*** at 567–68 (cleaned up).

Accordingly, to assess Appellant's ***Batson*** arguments, we first establish the totality of the circumstances surrounding the Commonwealth's exercise of peremptory challenges to strike Prospective Jurors No. 15 and 22. The general procedure was as follows. The court brought in each prospective juror one by

- 14 -

one for follow-up questioning on answers they supplied in written questionnaires and group responses at the start of *voir dire*. Of note, the questionnaire asked for the venireperson's race and contained check-the-box yes or no questions involving his or her prior jury service and experience with crime as a victim, witness, or defendant, both themselves and for people close to them. After the questioning was completed, Appellant and the Commonwealth alternated being the first to indicate whether each juror was acceptable.

Selection progressed without controversy as to the following prospective jurors, whose biographical information and ultimate juror status we summarize below:[5]

- No. 1: a black welder whose father had been a Philadelphia police officer.[6] The juror was accepted by both parties.

- No. 2: a black pharmacist who had been the victim of a theft and had witnessed a shooting, whose girlfriend had a family member who was murdered, and whose cousin was an assault victim. The juror was accepted by both parties.

- No. 3: a white teacher whose father and uncle were policemen and who had family members who were theft victims. Appellant exercised his first strike.

- No. 4: a white corporate lawyer who had witnessed crimes including a hit-and-run and property destruction. The Commonwealth exercised its first strike.

---

[5] We omit from our discussion jurors who were excused or stricken for cause.

[6] All jurors only discussed residence in the Philadelphia area unless we note otherwise.

- No. 6: a black individual of undisclosed profession whose relative had been murdered in New York and who believed that her husband had been charged with and convicted of felony gun offenses based upon a misunderstanding. The Commonwealth exercised its second strike.

- No. 7: a white occupational therapist who had lived in North Carolina until three years prior and had no experience with witnessing or being a victim of crime and had no connections with law enforcement. The juror was accepted by both parties.

- No. 8: a black account clerk who had two cousins who were state troopers, a cousin who was the victim of a carjacking, and a nephew who was prosecuted for sexual assault. The juror was accepted by both parties.

- No. 9: a black bus driver whose son's best friend was murdered when hit by a stray bullet. The juror was accepted by both parties.

- No. 11: a white accountant who moved to Philadelphia from Washington, DC four years prior and who had no experience with witnessing or being a victim of crime and had no connections with law enforcement. The juror was accepted by both parties.

- No. 12: a sports agency consultant and former truck driver of undisclosed race with two relatives who were Philadelphia police officers, whose brother-in-law was robbed at knife point, and whose nephew was charged with assault. Appellant exercised his second strike.

- No. 13: a black school custodian and former salesperson who witnessed a stabbing, whose sister was murdered and cousin prosecuted for rape, and who had both a friend and a cousin serving as police officers. The juror was accepted by both parties.

- No. 14: a black teacher with a criminal justice degree whose close friend was robbed at gunpoint and whose sister witnessed a murder. The Commonwealth exercised its third strike.

- No. 15: a black hospitality manager who relocated to Philadelphia from California eight years prior and who had no experience witnessing or being a victim of crime and had no connections with law enforcement. The Commonwealth exercised its fourth strike.

- No. 16: a white project manager who had been charged with DUI and went through a diversionary program. The juror was accepted by both parties.

- No. 17: a retail employee of undisclosed race who had been mugged and raped, who witnessed multiple retail thefts, and whose brother-in-law had been prosecuted for drug offenses. Appellant exercised his third strike.

- No. 18: a black graduate student who had attended school in West Virginia and Nebraska before relocating to Philadelphia approximately six years prior and who had no experience witnessing or being a victim of crime and had no connections with law enforcement. The juror was accepted by both parties.

- No. 20: a white human resources employee who had no experience witnessing or being a victim of crime and had no connections with law enforcement. Appellant exercised his fourth strike.

- No. 21: a white project manager in IT who relocated to Philadelphia from Wilmington, Delaware six or seven years prior and who had no experience witnessing or being a victim of crime and had no connections with law enforcement. The juror was accepted by both parties.

Controversy arose with Prospective Juror No. 22, a black school bus mechanic who had been out of high school for four years, who had no experience witnessing or being a victim of crime, and who had no connections with law enforcement. The Commonwealth exercised its fifth strike and Appellant asserted a **Batson** challenge. In pertinent part, the record reflects the following resolution of the issue:

> [DEFENSE]: Judge, I'm going to object, and I would like the Commonwealth to state, for the record, the basis of their challenges. And I'd like the record to reflect it was a young African-American male with prior jury service and that did not check one box on the questionnaire and responded to the Court, clearly, that he could be fair and impartial. I'd like to know what the Commonwealth's basis for that challenge was.

- 17 -

THE COURT: All right. Are you making a **Batson** challenge?

[DEFENSE]: Yes, I am, Your Honor.

[COMMONWEALTH]: Your Honor would have to find that, based on what we have here, that that's equivalent, based on the number of people that we have and what our challenges have been.

THE COURT: All right. Well, we have nine jurors seated.

[COMMONWEALTH]: Exactly.

THE COURT: Of the nine jurors, I don't know what their -- well, we can see what they are. I want to make sure the record is clear here so there's no issues.

[DEFENSE]: There's five African-Americans and [four] Caucasians.

. . . .

THE COURT: Okay. Now, in terms of the strikes, there was Juror No. 3. I just want to go back --

[COMMONWEALTH]: And that happens to be a white female.

THE COURT: All right. I just want to go back, so we have the record fully docketed and correct.

THE COURT CRIER: Your Honor, I have the Commonwealth striking No. 4.

THE COURT: Okay, but No. 3 was a white female.

[COMMONWEALTH]: No. 4 strike was a white female.

THE COURT: Yes. No. 6?

THE COURT CRIER: That would be No. 6.

[COMMONWEALTH]: Black female.

THE COURT CRIER: Then, Commonwealth 3 would be No. 14.

THE COURT:     That was a black male.

[COMMONWEALTH]:     Yes.

THE COURT CRIER:     And then, the Commonwealth's fourth strike was No. 15.

THE COURT:     Which was --

[DEFENSE]:     Which was a black female.

THE COURT:     Black female is No. 15.

[COMMONWEALTH]:     Based on that, does Your Honor find that there's some pattern?

THE COURT:     Well, from what I see, three of your strikes were used for African-Americans, one for a white female; am I correct?

[COMMONWEALTH]:     Hold on one second.

[DEFENSE]:     No. 14 is a black female.  No. 15 was a black female.  No. 6 was a --

[COMMONWEALTH]:     No. 4 -- Judge, the fact of the matter is it really is more of an issue of how many jurors have presented themselves and what the number has been in terms of --

THE COURT:     I just want to establish what numbers we're talking about.

Now, [Defense], are you contending that this strike, this last strike, that somebody else was allowed on the jury with these same characteristics or background?

[DEFENSE]:     No, Judge.  What I'm suggesting is there's absolutely no reason to strike the person that was just stricken by the Commonwealth.

[COMMONWEALTH]:     That's --

[DEFENSE]:     I mean, there was a person stricken earlier who answered the exact same way by the Commonwealth.  I think

- 19 -

Juror No. 14 didn't check any boxes, and she was a black female. She was stricken.

[COMMONWEALTH]:     And on --

[DEFENSE]:     Excuse me.

[COMMONWEALTH]:     I'm sorry.

[DEFENSE]:     Juror No. 15, Your Honor.  Juror No. 15 was a black woman and checked no boxes.  She was struck by the Commonwealth.  Up comes this juror, who also is a black person and also checked no boxes.

THE COURT:     Did you say Juror No. 14 checked no boxes?

[DEFENSE]:     Juror No. 14, I have as -- no, I'm sorry, Juror No. 15, I said.  I corrected myself, Your Honor.

Juror 14 checked some boxes.  She was stricken as well by the Commonwealth.  She was another black female.

THE COURT:     Right, but –

[DEFENSE]:     15 did not check one box.

THE COURT:     And was stricken.

[DEFENSE]:     And was stricken by the Commonwealth.  And now comes this juror, who is similarly situated, and does not check one box, and he's stricken by the Commonwealth.

THE COURT:     Well, this juror, I think, checked the prior juror before; am I right?

[DEFENSE]:     Correct.  All the more reason I renew my challenge.

[COMMONWEALTH]:     And, again, Your Honor, I can make the point that nothing was checked in, no experience that they had, nothing -- no crimes, no nothing, and I made that move.  But what Your Honor has to see is whether or not you've established some sort of pattern.  I would say that based on the people that we've

sat here today, and the number that we've gone through, there's no pattern established.

And what [Defense] just told you just two seconds ago was that, well, you know, it's almost like I don't have the right to take a gut feeling and say, you haven't checked off anything, I don't know anything about you, you know; where I've sat black male, black male, skip, black female, black male, black male, white female, and I suggest Hispanic female. What pattern has been established?

[DEFENSE]: It's not a Hispanic female, No. 1.

[COMMONWEALTH]: Whatever –

THE COURT: The issue is this. And I want to make sure the record is clear.

You have a right to strike whoever you want to strike, as long as it's not for gender or racial reasons. My question is, so that the record is clear for later on, the last person that you struck, No. 22, what was the reason there?

[COMMONWEALTH]: The reason was there was no experience. There was absolutely -- he wrote mechanic down on the side, has no experience, never knew anybody that was the victim of a crime, never knew anything. There was nothing to ask him. You simply said to him, sir, you marked off this; unlike the other people, where there was some dialogue, and you went on for a period of time.

THE COURT: Okay. And Mr. –

[DEFENSE]: No. 22 is a prior juror. What do you want --

[COMMONWEALTH]: I don't care. I'm not here --

THE COURT: Hold it. I don't want back and forth.

That's your reason for 22, and the other one that was raised of somebody who also didn't answer any questions, what number was that?

[DEFENSE]: 15.

- 21 -

THE COURT: 15. And the reason there, [Commonwealth]?

[COMMONWEALTH]: If I could just take a look at --

THE COURT: Sure.

[COMMONWEALTH]: Same thing, Your Honor; just recently got here from California, states she has no -- no one that she's ever known, nothing, no crimes, no one's ever been a victim of any crimes or anything like that. She just been simply in the hospitality thing. I didn't really think much of it on what she does or --

THE COURT: All right. So those are your reasons. And at this point, I don't see or find any pattern, and those reasons are race-neutral reasons that either side can decide they don't want certain types of people without background and experience.

[DEFENSE]: Including persons that have prior jury experience and have no other boxes checked.

THE COURT: Well, the person who has -- is there anybody on here who is put on who has the exact same thing as No. 22?

[COMMONWEALTH]: Judge, that's not the issue.

THE COURT: No, I'm just asking.

[COMMONWEALTH]: That's not the issue.

THE COURT: I don't see anybody who is like that from everything I've seen.

[DEFENSE]: Well, Juror No. -- there are people with prior jury duty that have been on put on on [*sic*] the --

[COMMONWEALTH]: The only prior --

[DEFENSE]: No. 4 sat on prior juries.

THE COURT: Let me just look here for a second.

[DEFENSE]: Juror No. 2.

- 22 -

THE COURT:        No. 4, I thought was stricken, right?

[DEFENSE]:        No. 4 was stricken, but Juror No. 2 had prior jury experience.

[COMMONWEALTH]:    Yeah, we accepted her.  We accepted her.  There were other questions that you asked --

THE COURT:        Wait a second.  Juror No. 2 answered other questions as to being a victim of a crime and being an eyewitness to a crime.

[DEFENSE]:        Yes.

THE COURT:        There's a difference there.  Based on what I see, I believe that strike was a proper use --

[DEFENSE]:        All right.

THE COURT:        -- and we've made a record, and let's go.

N.T. Trial, 3/1/22, at 125-35.

Selection then resumed with Prospective Juror No. 24, a black customer service employee who had studied criminal justice in college and who had no experience witnessing or being a victim of crime or connections with law enforcement.  When the Commonwealth indicated its desire to exercise a strike, Appellant reasserted his ***Batson*** challenge.  The following discussion ensued:

[DEFENSE]:        I raise the same issue, Judge; just for the record, another ***Batson*** challenge, another black female, no record other than prior jury service, identical to Juror No. 20, the Commonwealth --

THE COURT:        [Commonwealth], your reason?

[COMMONWEALTH]:    I think it's the same thing.  I don't see any experience or anything on there on any of the topics, other than

- 23 -

she was a previous juror. I don't have anything about her being a previous juror. I don't know what she answered as a previous juror.

. . . .

[DEFENSE]: I have the same challenge, Your Honor.

[COMMONWEALTH]: I'll accept.

THE COURT: Okay.

[COMMONWEALTH]: Make it on there, and I'll accept, but --

[DEFENSE]: Acceptable to the defense.

[COMMONWEALTH]: -- think that --

THE COURT: You don't have to. My question --

[COMMONWEALTH]: No, but my point is Your Honor is referencing a question to me. I think that I'm making similar strikes based on lack of experience of anybody, you know, based on this case.

THE COURT: You have a right to make that argument that they have no other experience, other than having been on a jury.

[COMMONWEALTH]: Exactly.

THE COURT: I think you said previously that -- I just want to make sure the record is clear as to what is going on here. If you want to accept, you can accept.

[COMMONWEALTH]: Okay. Well, that's -- the point that I'm making is that none of these other questions that I think will come to fruition on this case, this type of factual case, this scenario here, there's nobody that they know, there's been no other crime, no other -- they know nothing about any crimes or anything else, been involved in it, and that's fine. They could be a good character and everything else, but my point is that's my --

THE COURT: That's your basis.

[COMMONWEALTH]: Not based on any gender or race or anything.

[DEFENSE]: Judge, I find it difficult to believe that **Batson** somehow would allow for the argument that if somebody doesn't have a prior problem with police, or prior arrest in their family, or a police officer to whom they're related, that somehow that would make them more qualified than anybody that's already been selected for prior jury service?

THE COURT: I don't think --

[COMMONWEALTH]: It goes to experience, and I've made that clear.

[DEFENSE]: They have jury trial experience. Isn't that what you want?

THE COURT: Well, I think what's being referred to, if I'm correct, is no experience with being a victim of a crime or knowing somebody who's a victim of a crime or knowing somebody who's been arrested, eyewitness or any of these kinds of questions.

[COMMONWEALTH]: Correct.

THE COURT: Am I correct about that?

[DEFENSE]: And my argument, Judge, is[:] is it seriously being suggested that **Batson** says that people who have had some experience, either being arrested or people in the family being arrested or being related to police, make them more qualified than somebody that has none of those prejudices, and has already been accepted as a jur[or]? What possible reason would you have to get rid of two black persons who have prior jury service and no other checks against --

THE COURT: Because --

[DEFENSE]: -- jury selection.

THE COURT: -- the question is, both for your selections and for the DA's selections, whether or not these are race-neutral reasons.

Now, if there's a white juror that is seated, who has the same characteristics, just prior jury service, not answering any of the questions, that's an issue. Other than that, if there are race-neutral reasons, that's the question that **Batson** deals with. That's what I'm hearing, based on the strikes.

[DEFENSE]:        And I --

[COMMONWEALTH]:    And I don't have either way.  If Your Honor thinks it's too close to the line, I don't have a problem accepting --

THE COURT:      So, accept, and let's move on.

[COMMONWEALTH]:    Well, then I accept, and we move on.

N.T. Trial, 3/1/22, at 138-42.

Next was Prospective Juror No. 26, a person of undisclosed race who worked in health insurance marketing and had been a victim of a burglary and a mugging, who was accepted by both parties.  Prospective Juror No. 29, of undisclosed race, moved to Philadelphia from Boston two years prior, worked in the entertainment field, had no experience witnessing or being a victim of crime or connections with law enforcement, and was Appellant's fifth strike.

Prospective Juror No. 30, a law office manager of undisclosed race, had been the victim of a burglary and had cousins and friends who were police officers, as well as a brother who was arrested as part of what was later disclosed as systemic corruption within the 39th District of the Philadelphia Police.  The Commonwealth exercised its sixth strike and Appellant again invoked **Batson**, with the following discussion occurring:

[DEFENSE]:        **Batson**; exact opposite of what the Commonwealth says they were excusing --

- 26 -

[COMMONWEALTH]:     No --

THE COURT:     Hold it, hold it, hold it.

[Defense], you're making a ***Batson*** challenge –

[DEFENSE]:     I am, Your Honor.

THE COURT:     -- saying that this woman was struck for racial reasons.

[Commonwealth], your response.

[COMMONWEALTH]:     Your Honor, I think that what I'm responding, even though she said she could be fair, she stated that her brother had been arrested, and that her brother had been part of what she deemed the 39th District thing.  That would be the 39th District where all these people were charged illegally, arrested, convicted illegally, and then we had a whole entire -- as Your Honor remembers -- pause in this whole system.

[DEFENSE]:     I raise it, Judge, 'cause I was curious as to why with people that have no priors, and that was the basis for the Commonwealth's objection earlier on black persons --

[COMMONWEALTH]:     But this one affected her brother, directly, and she said that.

THE COURT:     If what I'm hearing is that prior had to do with experience, and here, her brother was illegally arrested in the 39th District Police scandal, which I'll take judicial notice of, and where police framed different defendants, and [Commonwealth] did not want somebody on the jury who was connected to this or had experience in family being illegally charged.

[DEFENSE]:     Well, this was -- before I was interrupted, Judge, I was just trying to say that earlier, people were being excused or challenged by the Commonwealth because they had no contacts or any kind of experience with the justice system. Here's a person who's related to police officers, has friends with police officers, has relationships with police officers, and just because there was an incident 20 years ago, 1992, I believe that scandal hit, 30 years ago, that other than the fact that she has

- 27 -

completely opposite of what the Commonwealth had previously relied upon to excuse people, she's excused.

[COMMONWEALTH]:     Your Honor, do you hear what he said?

THE COURT:        Okay.  Just -- we don't need to go on.

The issue that I heard from both counsel is this.  It's not an issue of being a burglary victim, and it's not an issue of cousins or friends in the Police Department.  It's an issue of her brother being illegally arrested and a police scandal where the police lied.  And based on that, if I'm hearing this correctly, [Commonwealth] doesn't want this juror on there, and I deny the motion or the challenge.  Let's go.

N.T. Trial, 3/1/22, at 157-60.

Next was Prospective Juror No. 31, who was white, worked in banking and had no experience witnessing or being a victim of crime or connections with law enforcement.  It was Appellant's turn to go first in accepting or striking the juror.  The following transpired:

[DEFENSE]:    Judge, I'd like the record to reflect that the only box I saw checked on him, just to make sure I'm clear –

[COMMONWEALTH]:        Are we going to start this --

THE COURT:    Hold it, hold it, hold it.  I'm going to stop it right now.

If it's defense, [Defense], accept or strike.

[DEFENSE]:    Acceptable.

THE COURT:    [Commonwealth].

[COMMONWEALTH]:        I'm going to accept,  based on -- and three picks before, Your Honor just asked me to accept and move on.  I'm going to accept.

[DEFENSE]:    For the record, if I may.  I'd like the record to reflect that this juror basically has checked in the same fashion that two

- 28 -

previous jurors checked, who both happen to be African-American. This juror has none of the experience that was the reliance basis for the Commonwealth to suggest that it was not race-based. This is a white, middle-aged man, retired, who checked one box that was prior jury service, identical to the other two persons who happen to be African-American persons, one woman and one man, and who were excused. And the basis for the excuse was the exact same reflection on their information questionnaire as this man's.

So I renew my challenge, Judge, to the other two individuals that were dismissed. They were black. This man's white. He's acceptable. They weren't. Exact same qualifications.

THE COURT: [Commonwealth].

[COMMONWEALTH]: Your Honor, I accepted him based on the fact that we have gone through this, and Your Honor asked me about a prior juror just three strikes before, and I said, okay, I'll accept that person.

THE COURT: No, but what I don't understand is the issue of the others --

[COMMONWEALTH]: Well, I agree with this one. I -- you know, I'm perfectly willing to strike him because he doesn't have any background.

THE COURT: So strike him.

[DEFENSE]: Well, Judge, you know, I mean --

THE COURT: I don't know what to say.

[DEFENSE]: -- no explanation for why you could do it to two black people, but when a white man comes up? And supposedly, it is exactly the same position that the Commonwealth --

THE COURT: From what I'm hearing -- just a second. From what I'm hearing as to No. 31, the Commonwealth is striking him.

[COMMONWEALTH]: Yes.

[DEFENSE]: But now he just changed his mind.

- 29 -

[COMMONWEALTH]:     Well, he's making sarcastic --

THE COURT:    Hold it, hold it.  One -- first of all, when I'm talking, please.

No. 2, if the Commonwealth is striking, then that takes the issue away.

[DEFENSE]:    Well, that's true, Judge, except for the **Batson** challenge raised earlier. Why wouldn't the Commonwealth then change its ruling -- or change its acceptance or rejection of those other two people?  He changed his mind on this one because he just realized he was not being consistent, and he had a problem.

[COMMONWEALTH]:     Your Honor, note for the record who we chose on this case.

THE COURT:    He can -- he can change his mind if he thinks that what he's doing is an issue, because of who else he struck, No. 1 --

[COMMONWEALTH]:     And the other people --

THE COURT:    -- No. 1 -- hold it, [Commonwealth].  No. 2, the same reason he's using here, he's used for the others.  So unless there's some difference between 31 and the others that he's also struck, and the last person that was accepted, I believe, was No. 26; am I correct about that?

[COMMONWEALTH]:     That's correct.

THE COURT:    And that person had certain experience.  And before that, I'm just going back here, No. 24 was accepted, who was an African-American female.  So that's [the Commonwealth's] No. 7, let's go.  Strike.

[COMMONWEALTH]:     Is that the seventh strike, Your Honor?

THE COURT CRIER:  It is.

N.T. Trial, 3/1/22, at 162-66.  The selection continued until the court had a jury of twelve, seven of whom were black and five white, with two white alternates.  **See** Trial Court Opinion, 8/22/22, at 33.

- 30 -

Upon this background, we consider Appellant's claims that the Commonwealth's striking of Prospective Jurors No. 15 and 22 violated **Batson**. He asserts that he is entitled to relief from this Court because the trial court erred in its application of **Batson** steps two and three, and abused its discretion in making factual findings that are unsupported by the record.[7]

Specifically, Appellant asserts that the trial court's second-prong ruling was faulty because the reasons offered by the Commonwealth, which he characterizes as having been the lack of affirmative responses on the written questionnaire and a "gut feeling," were "not race neutral because they are so outside the pale of a reasonable justification for each strike." Appellant's brief at 25. Appellant contends that these amount to general denials of discriminatory intent that do not satisfy the Commonwealth's burden. **Id**. (citing **Batson**, **supra** at 94 ("The State cannot meet this burden on mere

_____

[7] The trial court opines that Appellant failed to pass the first hurdle requiring him to make a *prima facie* showing that the Commonwealth's strikes were race-based. **See** Trial Court Opinion, 8/22/22, at 40-41. However, Appellant asserts that the fact that the trial court proceeded to the second prong by asking the Commonwealth to articulate its reasons for the strikes mooted the question of the legal sufficiency of the *prima facie* case. **See** Appellant's brief at 25. Since "[t]he law is not entirely consistent as to whether a court may proceed to the second-step **Batson** analysis when a defendant has failed to make out a *prima facie* case," we opt to take "the safer course of action" of basing our ruling upon examination of the second and third prongs. **Commonwealth v. Murray**, 248 A.3d 557, 570 (Pa.Super. 2021). Accordingly, we offer no opinion as to whether the facts asserted by Appellant were legally sufficient to establish a *prima facie* case.

- 31 -

general assertions that its officials did not discriminate or that they properly performed their official duties.")).

Appellant's representations of what race-neutral reasons were proffered by the Commonwealth for striking Prospective Jurors No. 15 and 22 are belied by the record. The Commonwealth did reference its right to follow a "gut feeling" in arguing that no *prima facie* case had been shown. **See** N.T. Trial, 3/1/22, at 131. However, when the court moved to the second prong and asked the Commonwealth for its reasons for exercising the strikes, it did not rely on gut feeling, but instead articulated concrete bases.

In particular, the Commonwealth indicated that it rejected No. 15 because (1) she was a hospitality manager who (2) had no experience as a crime victim "or anything like that," and (3) had moved to Philadelphia from California. **Id**. at 133. The Commonwealth stated that it struck No. 22, the recent high school graduate, because (1) his dialogue with the court during *voir dire* questioning was lacking compared to the other venirepersons, and (2) he "has no experience, never knew anybody that was the victim of a crime, never knew anything." **Id**. at 132.

Based upon consideration of the reasons actually offered by the prosecution, the trial court "concluded that the reasons offered by the Commonwealth were facially valid and could be considered race-neutral due to the lack of any stated discriminatory intent." Trial Court Opinion, 8/22/22, at 41. We agree. Neither of the potential jurors in question had any

prosecution-friendly experiences, such as being or knowing a crime victim or otherwise having positive ties to law enforcement. No. 15 additionally appeared unengaged throughout the process, suggesting that he might lack the attentiveness required to follow the web of evidence the Commonwealth intended to present. *See* Trial Court Opinion, 8/22/23, at 41. Meanwhile, No. 22's background in hospitality in California did not suggest a prosecution-friendly juror. Hence, the Commonwealth's proffered reasons for the strikes were not the legally-invalid general denials asserted by Appellant. Rather, the trial court's second-prong analysis is supported by the record.

As for the third *Batson* prong, Appellant claims "it is apparent that discrimination was at work" for several reasons. Appellant's brief at 27. He first asserts that the lack of experience cited by the Commonwealth as its basis for rejecting Nos. 15 and 22 "made no sense" because "the absence of such affirmative responses [to the experience questions] typically places the prospective jurors in a positive light" as one who lacks cause to be biased. *Id*. at 28. Second, Appellant argues that the Commonwealth's acceptance of white jurors who had no experience with crime or law enforcement indicates that the proffered race-neutral reasons were mere pretext. *Id*. Third, Appellant maintains that the prosecution's flip-flopping on whether to strike Potential Jurors No. 24 and 31 further proves the existence of pretext in the earlier strikes, as it negated the lack-of-experience rationale and left only race as the explanation for the different initial choices. *Id*. at 28-29.

The Commonwealth, represented in this case by the Philadelphia County District Attorney both at trial and on appeal, albeit through different attorneys, agrees with Appellant that *Batson* was violated, citing three facts that "are strongly indicative of discriminatory intent." Commonwealth's brief at 20. Those factors are: (1) the race-neutral explanation for striking Prospective Jurors No. 15 and 22 was unpersuasive because it had accepted similarly-situated white venirepersons; (2) it initially struck black Prospective Juror No. 24, but accepted after the defense cried foul; and (3) it did the opposite with Prospective Juror No. 31, initially accepting but then opting to strike. *Id*.

We reject both parties' arguments.[8] The trial court here plainly credited the Commonwealth's proffered race-neutral reasons for striking Prospective Jurors No. 15 and 22. The court then examined the totality of circumstances to determine whether Appellant had met his burden of persuading the court

---

[8] It is incumbent upon a district attorney "to see that the commonwealth's case is **fully and fairly** presented." *Commonwealth v. Myers*, 403 A.2d 85, 86 (Pa. 1979) (internal quotation marks omitted, emphasis altered). A prosecutor must **both** respect the defendant's rights to a fair trial **and** vigorously pursue the interest of the public in having the laws enforced. *See, e.g.*, *Commonwealth v. Clancy*, 192 A.3d 44, 52 (Pa. 2018); *Commonwealth v. Schultz*, 133 A.3d 294, 328 (Pa.Super. 2016). Given the abundantly reasonable alternative explanations for the strikes that are fully supported by the certified record, we are disturbed by the Commonwealth's decision to abdicate its duty to advocate on behalf of the citizens of Pennsylvania and the victim in this matter. Unlike the dissent, we do not presume that the Commonwealth opted to concede the *Batson* issue because the Assistant District Attorney in question privately admitted intentional racial discrimination. Rather, we accept at face value the legal positions stated in the Commonwealth's brief and deem them contrary to our standard of review.

that the reasons were pretextual and purposeful discrimination was the actual reason for the strikes. It properly looked at the inconsistencies alleged by Appellant, as well as the total makeup of the jury pool, chosen jurors, and strikes exercised, to see if there was a pattern to the Commonwealth's choices that suggested purposeful discrimination. *See Commonwealth v. Edwards*, 177 A.3d 963, 975 (Pa.Super. 2018) ("Statistics alone are insufficient to prove discriminatory intent. Statistics can be used, however, when considering the totality of the circumstances to determine if the Commonwealth exercised its peremptory strikes in a discriminatory manner." (internal citations omitted)). Finding no such evidence, the trial court made the factual determination that Appellant had not carried his burden of persuading the court that Prospective Jurors No. 15 and 22 were stricken in acts of purposeful discrimination.

It is readily apparent to this Court that the arguments for reversal advocated by both Appellant and the Commonwealth fail to appreciate and apply the appropriate appellate standard of review. As noted above, the trial court's third-prong conclusion is a finding of fact to which we must give "great deference" and overturn only if it was "clearly erroneous." *Murray*, *supra* at 568. The parties essentially ask us to look at the paper record and make a different determination as to the credibility and persuasiveness of the Commonwealth's motivations than the trial court made after examining the

prosecutor's demeanor and the totality of the circumstances.[9]  That we may not do.

Furthermore, our review of the record does not reveal the type of inconsistency alleged by Appellant.  In essence, Appellant took the reasons actually stated by the Commonwealth, recharacterized them as being limited to whether the person had criminal justice experience as a victim or juror, and cried foul because there were white potential jurors without experience who were not stricken.  However, as discussed above, the lack of experience with crime was **not** the only basis offered by the Commonwealth for striking Prospective Jurors No. 15 and 22, and was obviously not the sole determinative factor in the Commonwealth's decision whether to challenge any given juror.[10]  Moreover, the flip-flopping done by the prosecution in exercising subsequent strikes seems just as likely an exercise of extreme caution in response to what, on a cold record, appears to be attempts by defense counsel to bully the prosecution.  These arguments did not persuade

---

[9] Likewise, the dissent acknowledges our highly deferential standard of review, yet opts to run roughshod over it, supplanting the trial court's factual finding that no purposeful discrimination occurred with its own divination of the "real reasons" why the prosecution exercised its challenges based upon the credibility determinations it makes from its abridged review of the cold record. **See** Dissenting Opinion at 20-21.

[10] For example, the Commonwealth accepted black Prospective Juror No. 1 despite a lack of experience as a crime victim or witness, but that individual had a father who had been a police officer.  Conversely, the Commonwealth opted to strike white Prospective Juror No. 4, a corporate lawyer, although she did have experience as a witness to crimes.

the trial court that purposeful discrimination occurred, and do not persuade us that the trial court abused its discretion in finding that Appellant had ultimately failed to prove his claims.[11]

Nor do we discern any legal error. Appellant asserts that the trial court misapplied the law in looking for a pattern of discrimination rather than considering whether each strike was itself an act of discrimination violative of the Equal Protection Clause. *See* Appellant's brief at 30 (citing ***Batson***, ***supra*** at 95). ***See also Flowers v. Mississippi***, 139 S.Ct. 2228, 2242 (2019) ("[E]ven a single instance of race discrimination against a prospective juror is impermissible.").[12]

---

[11] The dissent cites a list of ways in which a defendant can prove a ***Batson*** challenge, such as by pointing to the prosecution's disparate questioning of black and white jurors or to its exercise of strikes in past cases. *See* Dissenting Opinion at 5 (citing ***Flowers v. Mississippi***, 139 S.Ct. 2228, 2243 (2019). The dissent then seems to indicate that a trial judge has an obligation to look for the applicability of every such factor whether the Appellant had advocated them or not. ***Id***. a 6. In our view, any lack of consideration of potentially relevant factors in this case is attributable not to an error of law by the trial court, but to Appellant's arguable failure to make a record of a *prima facie* ***Batson*** violation in the first place as noted *supra* at n.7.

[12] The dissent also suggests that the trial court denied Appellant's ***Batson*** challenges solely based upon the lack of any pattern of discrimination gleaned from a statistical examination of the prospective jurors and strikes, and that we opt to employ our own, different reasoning in affirming the trial court's ruling. *See* Dissenting Opinion at 16-17, 19-21, 23. We deem it unnecessary to refute each instance of impropriety leveled at us by the dissent, as it is obvious from an objective reading of our opinion that the dissent's representations are inaccurate.

However, we see no indication that the trial court was of the impression that a pattern of discrimination was necessary to establish a **Batson** violation. Indeed, in reciting the third prong of the **Batson** analysis, the court made no reference to any requirement of a pattern, acknowledging that the issue was whether an examination of the totality of the circumstances persuaded it that the prosecution in fact acted with discriminatory intent. **See** Trial Court Opinion, 8/22/22, at 39. Rather, the court sought any such pattern of discrimination to establish that Commonwealth's proffered motivations for striking each of the individual jurors were unreliable. Finding none, nor any other circumstances to overturn its credibility determination, the trial court properly rejected Appellant's claims that the Commonwealth's decisions to strike Prospective Jurors No. 15 and 22 were acts of purposeful discrimination.

For the foregoing reasons, we conclude that Appellant has presented no valid basis for this Court to disturb any of the trial court's rulings on the questions presented. Accordingly, we uphold his judgment of sentence.

Judgment of sentence affirmed.

Judge Stabile joins this Opinion.

Judge Pellegrini files a Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>12/12/2023</u>